Argued and submitted January 12, decision of the Court of Appeals reversed, judgment of circuit court affirmed June 10, 2004, *cert den*, 125 S Ct 867 (2005)

In the Matter of the Marriage of

Rayne Elizabeth O'DONNELL-LAMONT (deceased),
*Petitioner,*

*and*

Michael David LAMONT, Jr.,
*Respondent on Review,*

*and*

Christine and Patrick O'DONNELL,
*Petitioners on Review,*

*and*

Darrell MILLER,
*Intervenor-Respondent.*

(C98 1284 DR; CA A112960; SC S50551)

91 P3d 721

Eli D. Stutsman, Portland, argued the cause and filed the brief for petitioners on review. With him on the brief were David L. Heifetz, Jacqueline Koch, and Koch & Deering.

Philip F. Schuster II, of Dierking & Schuster, Portland, argued the cause and filed the brief for respondent on review.

F.G. (Jamie) Troy II, of Law Office of Ronnee S. Kliewer, Portland, filed the brief for *amicus curiae* Basic Rights Oregon, Inc. With him on the brief was Shaun Wardinsky, of Yates, Matthews & Marasch, P.C., Portland.

Darcia Krause, Portland, filed the brief for herself as *amicus curiae*.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.**

BALMER, J.

---

** Kistler, J., did not participate in the consideration or decision of this case.

**BALMER, J.**

We allowed review of this child custody proceeding to consider the appropriate application of changes that the legislature made to the third-party custody statute in 2001, following the United States Supreme Court's decision in *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000). The trial court awarded custody of the two children in this proceeding to maternal grandparents (grandparents) rather than to father, and the Court of Appeals reversed. *O'Donnell-Lamont and Lamont*, 184 Or App 249, 56 P3d 929 (2002), *modified and adhered to as modified by an equally divided court*, 187 Or App 14, 67 P3d 939 (2003). For the reasons that follow, we reverse the decision of the Court of Appeals and affirm the judgment of the trial court.

## I. FACTS

In reviewing a decision of the Court of Appeals that is an appeal from a suit in equity, this court may review *de novo* or may limit its review to questions of law. ORS 19.415(4); *see State ex rel SOSCF v. Stillman*, 333 Or 135, 138, 36 P3d 490 (2001) (reviewing termination of parental rights case *de novo*). In this case, we elect to review the record *de novo*, because the Court of Appeals did not address all the issues that we conclude must be considered (including certain issues that depend on factual findings), and our reversal of the decision of the Court of Appeals on dispositive issues that it did consider otherwise would require a remand to that court and the delay that necessarily would attend further proceedings.[1] In our *de novo* review of the record, we give "considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony." *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990). We first review the facts leading up to this custody dispute and then supplement those facts from the record as needed in our discussion of the applicable legal standards.

---

[1] We also note that the parties agreed at oral argument in this court that the factual record developed in the trial court was sufficient to resolve the issues in this case and that a remand to the trial court to take additional evidence is unnecessary.

We find the following facts. Father and mother were married in 1991 and had two children—Taryn, born in 1992, and Seaira, born in 1996. Father and mother lived with grandparents for several months after Taryn was born, then moved to the Detroit Lake area near the paternal grandfather. In 1994, mother and Taryn, and later father, moved to Tualatin and then to Hillsboro. In both locations, the family lived within walking distance of grandparents, and the children had day-to-day contact with grandparents during much of that time. The family chose to live near grandparents in part because mother suffered from a congenital heart defect, which later caused her death, and grandparents provided childcare as well as emotional and, at times, financial support. Mother was the primary caregiver for the children, in part because father worked as a long-haul truck driver, which required him to be away from home several nights a week. At other times during the marriage, father worked as a contractor and as a construction worker at job sites that required him to be away from home.

Parents' marriage began to deteriorate in 1997, and father and mother separated and reunited on several occasions. In March 1998, mother obtained a Family Abuse Prevention Act restraining order against father, although mother apparently enforced the order only when it suited her, and both mother and father ignored the order at other times. For example, mother and father traveled together to Hawaii with the children in July 1998, despite the restraining order and the fact that, in April 1998, mother had petitioned to dissolve the marriage. The dissolution of parents' marriage became effective in September 1998. Father had moved to Eugene, however, and did not take advantage of all the parenting time provided for in the dissolution decree. Twice during father and mother's last separation, father violated the restraining order in a manner that was alarming or threatened violence to mother. On one of those occasions, father appeared at mother's residence when mother and children were there. The police subsequently arrested him, and he pled guilty to violating the restraining order.

After the dissolution, mother began a relationship with Darrell Miller. In March 1999, Miller, mother, and the children went to Disneyland. While they were there, mother

died of her preexisting heart condition. Miller and the children returned to Oregon, where father and grandparents met them.

At the time of mother's death, father was working in Eugene and living in a trailer. Father acknowledged that his living situation was not appropriate for the children, and father and grandparents agreed that the children would stay with grandparents. Although father and grandparents at one point anticipated that the children might live with grandparents for as long as several years, during the summer of 1999 father reasserted his right to custody of the children, which grandparents disputed. The parties attempted unsuccessfully to mediate their dispute, and the children became the subject of a tug of war between father and grandparents. In July 1999, father refused to return children to grandparents after a visit, without telling grandparents in advance. Later that month, grandparents, while in possession of the children, sought and received a court order awarding them temporary custody. The court ordered the children returned to father, who by that time had acquired a house in Keizer. Father assured the court that he would keep the children in the Salem area. However, despite that promise, father moved to Montana with the children and his girlfriend, Laura Oliver, in September 1999, without notice to the court or grandparents. Father refused to disclose his address in Montana to grandparents and avoided grandparents' efforts to serve him with legal papers. The court found father in contempt and ordered him to return the children to Oregon, which he did. After living in Montana for about six weeks, father, Oliver, and the children moved to the Detroit Lake area, and father and Oliver later purchased a house in Lyons.

## II.   PROCEEDINGS BELOW

After a hearing on the merits, the trial court in July 2000 awarded permanent custody to grandparents, with substantial parenting time to father. The trial court issued a letter opinion making extensive findings of fact. The trial court relied on the testimony of the parties and numerous other witnesses, including Dr. Edward Vien, a clinical psychologist appointed by the court, who spent 27 hours interviewing family members and conducting psychological tests. The trial

court found that the children are bonded to father and to grandparents and that father loves the children, has attempted to provide for them, and has the potential to be a good custodial parent. However, the court also found that father had lied repeatedly during the hearing, had an unstable job and residence history, had used illegal substances during the marriage, had abused mother, and had difficulty controlling his anger. Although father claimed to have overcome those problems, the trial court found that he was "unconvincing." Based on his testimony in the trial court, the trial court found that father was "dishonest" and that he lacked credibility. For those and other reasons, the trial court determined that father had serious shortcomings and deficiencies as a parent.

In regard to grandparents, the trial court found that grandparents had provided the children with food, clothing, shelter, and other physical necessities, as well as care, education, and discipline. The court noted that grandparents had played a "closely supportive role" for many years in helping mother raise the children. The court also found that grandparents had a more constructive interest in, and attitude toward, the children than did father. However, the court also identified several negative factors regarding grandparents, including grandparents' tendency to dote on the children, their efforts to "control" father and the children, and their desire to prevent father from having the children.

The trial court began its legal analysis with ORS 109.119 (1999), which, at the time of the hearing, established the standards for the court to use in determining whether grandparents had shown "emotional ties creating a child-parent relationship" with the children.[2] Having found that

_____

[2] ORS 109.119 (1999) provided, in part:

"(1) Any person, including but not limited to a related or nonrelated foster parent, stepparent or relative by blood or marriage who has established emotional ties creating a child-parent relationship or an ongoing personal relationship with a child, or any legal grandparent may petition or file a motion for intervention with the court having jurisdiction over the custody, placement, guardianship or wardship of that child, or if no such proceedings are pending, may petition the court for the county in which the minor child resides for an order providing for relief under subsection (3) of this section.

"* * * * *

grandparents had proved such a relationship, the court then considered father's argument that, as the biological parent, he had a "supervening right" to custody unless he was shown to be unfit. Father had argued that he was a fit legal parent and that, under *Hruby and Hruby*, 304 Or 500, 748 P2d 57 (1987), the court should award him custody in the absence of a "compelling threat" to the present or future well-being of the children. The trial court rejected that argument, stating that this court's decision in *Sleeper and Sleeper*, 328 Or 504, 982 P2d 1126 (1999), had concluded that the applicable version of ORS 109.119 did not incorporate *Hruby*'s "compelling threat" standard.

Although the trial court rejected the "compelling threat" standard as inconsistent with ORS 109.119 (1999), it nevertheless concluded that, to protect a legal parent's constitutional rights, *Hruby* required a "compelling reason" to grant custody to a psychological parent over a legal parent. The court further noted that a psychological parent could meet the "compelling reason" standard when the legal parent's custody would be "highly detrimental" to the child. Moreover, in applying that standard, the trial court ruled that detrimental *conduct* by the legal parent did not have to be shown; detrimental circumstances would suffice.

Reviewing the facts discussed above, the court found that "father [was] not so unfit as to justify termination of his parental rights" but that, given his shortcomings as a parent and the grandparents' status as psychological parents, it was appropriate for the court to determine custody based on the

---

"(3)(a) If the court determines that a child-parent relationship exists and if the court determines by a preponderance of the evidence that custody, guardianship, right of visitation, or other generally recognized right of a parent or person in loco parentis, is appropriate in the case, the court shall grant such custody, guardianship, right of visitation or other right to the person, if to do so is in the best interest of the child. The court may determine temporary custody of the child or temporary visitation rights under this paragraph pending a final order."

The 2001 Legislative Assembly amended ORS 109.119, and we discuss those amendments in detail below. 337 Or at 102-09; *see* Or Laws 2001, ch 873, §§ 1, 1a, 1e. The 2003 Legislative Assembly also amended the statute, but those amendments do not affect the decision in the case before us. *See* Or Laws 2003, ch 143, §§ 1-2; ch 231, §§ 4-5; ch 576, §§ 138-139. All subsequent references to ORS 109.119 are to the 2001 version, unless otherwise noted.

best interests of the children. Applying the nonexclusive considerations respecting that standard that are listed in ORS 107.137,[3] the court determined that it was in the children's best interests for the court to award custody to grandparents, with substantial parenting time to father.

The trial court also addressed the impact of the United States Supreme Court's decision in *Troxel*, which had been decided after the hearing, but before the trial court opinion. As discussed in greater detail below, in *Troxel*, a plurality of the Supreme Court held that the Due Process Clause "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." 530 US at 66. The Court concluded that a Washington statute that authorized a court to award visitation rights to any nonparent if the "visitation may serve the best interest of the child" unconstitutionally infringed the parent's right to make decisions concerning the child. *Id.* at 75. The Court failed to articulate the scope of the parent's right, holding only that, to meet due process requirements, "at least some special weight" must be given to a fit parent's determination of whether such visitation is in the child's best interest. *Id.* at 70.

The trial court determined that its decision to award custody to grandparents was consistent with *Troxel*. The trial court noted that the Court in *Troxel* had considered a "much broader" state law that would have allowed "any person" to pursue visitation rights and that the plurality opinion expressly had rejected a harm standard, *i.e.*, that the psychological parent must show that the child will be harmed if left with the legal parent for the psychological parent to prevail in a custody dispute. The trial court also pointed out that Oregon's presumption, developed in the custody case law, that a fit parent acts in the best interest of the child, was consistent with *Troxel*'s requirement to "accord at least some

---

[3] ORS 107.137 provides a nonexclusive set of factors for courts to consider in determining the "best interests and welfare" of a minor child when deciding to whom to award custody of the child in the context of a dissolution proceeding. Although ORS 107.137 is part of the marital dissolution statute, this court has approved the use of that standard in determining the "best interests of the child" under the third-party custody statute, ORS 109.119. *Sleeper and Sleeper*, 328 Or at 511.

special weight to the parent's own determination." 530 US at 70. In the trial court's view, because it had applied the presumption to which father was entitled and nevertheless had determined that it would be in the best interests of the children to award custody to grandparents, its decision complied with the Oregon law then in effect and met the due process requirements as stated in *Troxel*.

Father appealed and, as noted, the Court of Appeals reversed. In the initial panel decision, that court, like the trial court, applied ORS 109.119 (1999) in light of its understanding of *Troxel*. Unlike the trial court, however, the Court of Appeals viewed *Troxel* as raising the standard previously applied in Oregon for qualifying nonparents, like grandparents here, to meet if they are to prevail over fit parents in a custody dispute. 184 Or App at 254-55. Specifically, the Court of Appeals interpreted *Troxel* to require a showing by the nonparents that was more similar to the "compelling threat" standard articulated by this court in *Hruby* than to this court's later, but still pre-*Troxel*, decisions such as *Sleeper*. 184 Or App at 253-56. The Court of Appeals stated:

> "[T]o overcome the presumption in favor of father under ORS 109.119(2)(a) (1997), grandparents must establish that the evidence as a whole preponderates in their favor, that is, that father *cannot or will not provide adequate love and care* for the children or that placement of the children in father's custody *will cause them undue physical or psychological harm.* * * * That means that the court must find by a preponderance of the evidence either that the parent cannot or will not provide adequate love and care or that the children will face an undue risk of physical or psychological harm in the parent's custody."

*Id.* at 256 (emphasis added). Applying that standard, the Court of Appeals concluded that grandparents' evidence did not rise to the level necessary to overcome the presumption that father would act in the best interests of the children and was entitled to custody. Accordingly, that court reversed the judgment of the trial court and remanded with instructions to award custody to father. *Id.* at 259.

Grandparents petitioned for reconsideration, arguing that the Court of Appeals should have applied the 2001

amendments to ORS 109.119 in its *de novo* review of the trial court decision. As noted, the legislature adopted those amendments after *Troxel*. The amendments replaced the existing statute, which allowed a court to award custody to a nonparent who met certain criteria, if the court determined that custody was "appropriate in the case" and was "in the best interest of the child." ORS 109.119(3)(a) (1999). As discussed in detail below, the 2001 amendments established a statutory presumption that a legal parent acts in the best interest of the child and identified the kinds of factors a court may consider in determining whether a nonparent seeking custody of a child has rebutted that presumption. The 2001 amendments had been adopted after the trial court's decision, but before the argument in the Court of Appeals.

The Court of Appeals, en banc, agreed with grandparents and modified the panel opinion to state that the 2001 amendments "are fully retroactive." 187 Or App at 17. The court was divided, however, regarding the effect of the 2001 amendments on its decision and on the appropriate disposition of the case. Judge Edmonds, the author of the panel decision, joined by three other members of the court, concluded that the result under the 2001 amendments would be the same as the panel's decision, declined to remand for further trial court proceedings under the 2001 amendments, and adhered to the panel opinion as modified. Three additional opinions were filed. In all, five members of the court adhered to the panel decision, as modified, and five members dissented in part, arguing that the case should be remanded for further development of the record. Because the court was evenly divided, the court adhered to the panel decision as modified.

## III. THE 2001 AMENDMENTS TO ORS 109.119

### A. *Background*

This court has not been required, prior to this case, to address *Troxel* or the changes to ORS 109.119 that the legislature adopted after *Troxel*. For that reason, it will be helpful to review the nature of the dispute before this court and to examine the Supreme Court's decision in *Troxel*, before turning to our statutory analysis.

This case involves a third-party custody dispute between grandparents and father. In contrast to a proceeding to *terminate* parental rights under ORS 419B.498 to 419B.530, the state is not a party to this case, no one claims that father is "unfit" to be a parent, and father's status as a legal parent is not at issue. The only issue here is custody. Although any decision awarding custody to a third party is a serious intrusion on a parent's right to care for and make decisions for a child, it is less drastic than the termination of the parent-child relationship and, as we discuss below, the statutory standard also is less demanding. *See Stillman*, 333 Or at 149-50 (parental rights may be terminated only if parent is "unfit" and that conduct or condition is "seriously detrimental" to children).

A custody dispute also involves a less significant interference with parental rights than does a juvenile dependency proceeding in which the court determines that a child is within the jurisdiction of the court based on a finding that a parent has, among other things, abandoned the child or failed to provide "care, guidance and protection necessary for the physical, mental or emotional well-being" of the child, ORS 419B.100(A), (D). In those circumstances, as in a termination proceeding, the state intervenes to relieve a parent of ordinary parental responsibilities and to assume control over decisions about such matters as shelter and health care.

On the other hand, a custody decision involves a greater potential intrusion on parental interests than a decision regarding visitation. Father here has more at stake than whether the children are to spend every other weekend with grandparents. The decision as to who will have primary custody of the children will alter in fundamental, unknowable ways the lives of the children, father, and grandparents. Courts make these difficult decisions fully aware of their potential consequences for all the individuals involved.

Another critical aspect of the background of the 2001 amendments to the third-party custody statute, and therefore of our decision in this case, is the Supreme Court's decision in *Troxel*, to which we now turn. As noted, the parties agree that the 2001 amendments to ORS 109.119 were adopted in response to *Troxel*. We begin with a review of

what the Court decided—and what it did not decide—in *Troxel*, because that discussion provides important context for construing the amended statute.

In *Troxel*, the Court reviewed a decision of the Washington Supreme Court that had considered three consolidated challenges to a state statute that permitted nonparents to obtain visitation rights if a court determined that visitation was in the best interest of the child. The Washington court had held that the statute unconstitutionally interfered with the rights of parents to rear their children. That court found the statute to be constitutionally deficient because it permitted the state to interfere with the rights of parents to rear their children without any threshold showing of harm to the children and also because it allowed "any person" to petition for court-ordered visitation of a child at "any time," contrary to a parent's wishes, subject only to a best-interests-of-the-child standard. *In re Smith*, 137 Wash 2d 1, 15-20, 969 P2d 21, 28-31 (1998). The United States Supreme Court affirmed, although it did not adopt the analysis of the Washington Court.

The Court held that the statute, as applied to the facts there, violated the legal parent's fundamental right, protected by the Due Process Clause, to make decisions concerning the child. The Court failed to produce a majority opinion. Justice O'Connor wrote the plurality opinion, in which the Chief Justice and Justices Breyer and Ginsburg joined. The plurality held that the Due Process Clause "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 US at 66. The plurality emphasized, however, that a parent's right to make decisions related to a child is not absolute, but rather provides the basis for a "presumption that fit parents act in the best interests of their children." *Id.* at 68. The problem in *Troxel*, according to the plurality, was "not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to [mother's] determination of her daughters' best interests." *Id.* at 69. The plurality stated that, when a decision made by a fit parent is subject to judicial review, due process requires that

the court "accord at least some special weight to the parent's own determination." *Id.* at 70.

The plurality, however, provided no specificity as to the extent of the parents' right or the evidence required to overcome the parental presumption. Indeed, the plurality expressly declined to "define * * * the precise scope of the parental due process right in the visitation context." *Id.* at 73. Instead, the plurality stressed the nuanced, case-specific nature of the inquiry. It agreed with Justice Kennedy's dissenting opinion that the constitutionality of any standard in this area "turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best 'elaborated with care.' " *Id., quoting* 530 US at 101 (Kennedy, J., dissenting).

Three other members of the Court, although not joining in the plurality opinion, agreed that the Due Process Clause protects parental interests in decisions regarding children, but that the parental interest is qualified. Justice Souter wrote a separate opinion concurring in the judgment. He pointed out that the Washington statute authorized "any person" at "any time" to seek visitation rights "subject only to a free-ranging best-interests-of-the-child standard." *Id.* at 76. Because that statute failed to give any recognition to the due process rights of parents to make decisions regarding their children, Justice Souter stated that the statute was unconstitutional on its face. *Id.* at 76-77. Justice Stevens wrote a separate opinion in which he agreed that parents have a "fundamental liberty interest in caring for and guiding their children," that that interest is not absolute, and that the presumption that parents will act in the best interests of their children is a rebuttable one. *Id.* at 86-87 (Stevens, J., dissenting). Justice Stevens dissented, however, because the plurality did not address what he viewed as the Washington Supreme Court's erroneous holding that the federal constitution "requires a showing of actual or potential 'harm' to the child" to overcome the presumption that a fit parent acts in the best interest of a child. *Id.* at 86. Justice Kennedy dissented for the same reason, stating that the Washington court erred in applying a "harm" standard to overcome the

parents' right to make decisions for their children. *Id.* at 94, 101-02.

Justice Thomas concurred in the judgment. He stated that, because the Due Process Clause protects a "fundamental right of parents to direct the upbringing of their children," any infringement of that right is subject to "strict scrutiny." *Id.* at 80 (Thomas, J., concurring). In his view, the State of Washington lacked "even a legitimate governmental interest—to say nothing of a compelling one—in second-guessing a fit parent's decision regarding visitation with third parties." *Id.*

Finally, Justice Scalia dissented on the ground that the Due Process Clause provides no protection for "parental rights," and the Washington legislature therefore was free to adopt the "best interest" test that was challenged in *Troxel.* 530 US at 91-92 (Scalia, J., dissenting).

The absence of a majority opinion in *Troxel* and the array of viewpoints expressed in the six different opinions make it difficult to identify the scope of the parental rights protected by the Due Process Clause or the showing that the state or a nonparent must make before a court may interfere with a parent's custody or control of a child.[4] However, two conclusions safely can be drawn from *Troxel*. First, with the exception of Justice Scalia, all the members of the Court agreed that the Due Process Clause protects, to some degree, a fit parent's right to make decisions for a child. Second, of the eight justices who recognized a constitutional protection for parental rights, only Justice Thomas concluded that the constitution requires strict scrutiny of state actions that intrude upon those rights.[5] The other opinions articulated an undefined but less exacting standard. As noted, the plurality

---

[4] *See* Emily Buss, *Adrift in the Middle: Parental Rights After Troxel v. Granville*, 2000 Sup Ct Rev 279, 312 (2001) ("A detailed search [of *Troxel*] for some concrete criteria produces a handful of near contentless assertions about what the constitutional protection allows and requires."); *The Supreme Court, 1999 Term— Leading Cases*, 114 Harv L Rev 229, 229 (2000) ("[T]he plurality's failure to elaborate on the mechanics of the constitutional standard will leave judges, legislators, and individual litigants without adequate guidance.").

[5] *See* Buss, 2000 Sup Ct Rev at 283 (Except for the separate opinions of Justices Scalia and Thomas, "all four [opinions] recognized some constitutional protection for parental rights, but none suggested that the right is particularly strong.").

held that "some special weight" must be given to a parent's determination of what is in the child's best interest, but did not elaborate on the nature or extent of that "weight." Nevertheless, a majority of the Court strongly indicated that the presumption in favor of a parent's decisions was not so strong that it could be overcome only by a showing that the parent poses a risk of harm to the child. As previously discussed, Justices Stevens and Kennedy each expressly rejected the Washington Supreme Court's conclusion that a finding of harm to the child is required to overcome the parental presumption. 530 US at 85-86, 89-90 (Stevens, J., dissenting); *id.* at 94-96 (Kennedy, J., dissenting). Moreover, the plurality declined to consider the lower court's reliance on the "harm" standard, *id.* at 73, but cited with approval various statutes that would be inconsistent with such a standard, *id.* at 70-71.[6]

The Supreme Court's decision in *Troxel* led directly to the 2001 amendments to Oregon's statute regulating third-party custody and visitation claims. As previously discussed, ORS 109.119(3)(a) (1999) allowed a court to award custody to a psychological parent if the court determined that custody "was appropriate in the case" and was "in the best interest of the child." That statute was less "open-ended" than the Washington statute at issue in *Troxel,* because it limited the class of third parties who could seek custody or visitation and also because of cases interpreting the statute to impose a presumption in favor of the legal parent. The statute nevertheless appeared likely to draw a constitutional challenge under *Troxel* because it failed to assign any special weight or deference to the legal parent's interest in the custody and control of a child. For that reason, the legislature undertook to amend the statute.

B. *Retroactivity of the 2001 Amendments*

Before we consider the legislature's 2001 amendments to ORS 109.119, we must decide the threshold issue whether those amendments are retroactive and therefore

---

[6] For a discussion of the consideration of the "harm" standard in the various *Troxel* opinions, *see* Buss, 2000 Sup Ct Rev at 283, 303-05.

applicable to this case. Grandparents filed the custody petition in 1999, and the trial occurred in 2000. Father argues that the 2001 amendments apply only to custody proceedings in which the petition seeking custody was filed after July 31, 2001, the effective date of the 2001 amendments. As noted, all members of the Court of Appeals rejected that argument, agreeing that the legislature made the 2001 amendments applicable to all custody proceedings filed "before, on or after" July 31, 2001. 187 Or App at 17-18. We agree with the Court of Appeals' determination of that issue and do not address it further.

## C.  The Text and Structure of ORS 109.119

We now turn to ORS 109.119, which establishes the law that we must apply in determining custody as between a legal parent, such as father, and other persons who have established a child-parent relationship with a child, such as grandparents here.[7] That statute provides, in part:

> "(1)  [A]ny person, including but not limited to a related or nonrelated foster parent, stepparent, grandparent or relative by blood or marriage, who has established emotional ties creating a child-parent relationship * * * with a child may petition or file a motion for intervention with the court having jurisdiction over the custody * * * of that child, or if no such proceedings are pending, may petition the court * * * for an order providing for relief under subsection (3) of this section.

> "(2)(a)  In any proceeding under this section, there is a presumption that the legal parent acts in the best interest of the child.

> "* * * * *

> "(3)(a)  If the court determines that a child-parent relationship exists and if the court determines that the presumption described in subsection (2)(a) of this section has been rebutted by a preponderance of the evidence, the court

---

[7] Former ORS 109.119(8)(a) (2001), renumbered as ORS 109.119(10)(a) (2003), defines the term "child-parent relationship." Here, the trial court found, and father does not dispute, that grandparents established a "child-parent relationship" within the meaning of the statute. Accordingly, we do not discuss further that aspect of ORS 109.119.

shall grant custody * * * to the person having the child-parent relationship, if to do so is in the best interest of the child. * * *

"* * * * *

"(4)(b)  In deciding whether the presumption described in subsection (2)(a) of this section has been rebutted and whether to award custody, guardianship or other rights over the objection of the legal parent, the court may consider factors including, but not limited to, the following, which may be shown by the evidence:

"(A)  The legal parent is unwilling or unable to care adequately for the child;

"(B)  The petitioner or intervenor is or recently has been the child's primary caretaker;

"(C)  Circumstances detrimental to the child exist if relief is denied;

"(D)  The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or

"(E)  The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor.

"* * * * *

"(8)  As used in this section:

"* * * * *

"(b)  'Circumstances detrimental to the child' includes but is not limited to circumstances that may cause psychological, emotional or physical harm to a child."

Although, as this case demonstrates, application of ORS 109.119 to specific circumstances may involve difficult and close determinations and the exercise of Solomonic judgment by the finder of fact, the statute establishes a clear roadmap for that decision-making process. As noted, only persons who have demonstrated a child-parent relationship with the child have the right to seek custody under ORS 109.119. ORS 109.119(1). In such a custody proceeding, the legal parent is presumed to act in the best interest of the child. ORS 109.119(2)(a). That presumption can be rebutted,

however, by a preponderance of the evidence, and the statute identifies five nonexclusive factors that the court may consider in determining whether the presumption has been rebutted (rebuttal factors). ORS 109.119(3), (4)(b). Finally, the statute provides that, if the evidence rebuts the presumption in favor of the legal parent, the court shall award custody to the person having the child-parent relationship with the child, but only if to do so is in the best interests of the child. ORS 109.119(3)(a).

### D.   The Parties' Contentions Regarding ORS 109.119

The parties agree that ORS 109.119 (2001) is facially constitutional.[8] They disagree, however, over the interpretation of the statute and its application to this case. Grandparents contend that the evidence at trial supported each of the five nonexclusive factors of ORS 109.119(4)(b) that the court may consider in determining whether the evidence has rebutted the presumption. Grandparents argue first that undisputed evidence supports the factors set out in ORS 109.119(4)(b)(B) and (D) because grandparents had been the children's "primary caregivers" in the months after mother's death, and father had "fostered, encouraged or consented to" the relationship between grandparents and the children. Second, grandparents assert that the evidence supported a finding under ORS 109.119(4)(b)(E) that father had "unreasonably denied or limited contact" between the children and grandparents by moving the children to Montana without notice to grandparents and in violation of a court order. Finally, grandparents argue that father is "unwilling or unable to care adequately" for the children and that "circumstances detrimental to the child[ren] [would] exist" if the court awarded custody to father, ORS 109.119(4)(b)(A) and (C), based on findings by the trial court as to, among other things, father's job and home instability, past substance abuse, difficulty in controlling his anger, and dishonesty.

Father responds that the evidence at trial was not sufficient to rebut the presumption that he acts in the best interest of the children. Father then makes a multifaceted

---

[8] It follows that there is no issue before us respecting the constitutionality of ORS 109.119 (2001), and we express no opinion concerning that issue.

legal argument, the primary thrust of which is that the court should interpret ORS 109.119 to permit rebuttal of the parental presumption only by a showing that "the parent is *unable* to adequately care for the child or that custodial placement with the parent *will harm* the child." (Emphasis added.) If that interpretation is not required by the words and legislative history of ORS 109.119, father concludes, *Troxel* nevertheless compels such a reading for the statute to be consistent with the Due Process Clause. Put another way, father argues that if ORS 109.119, as applied to the facts here, results in the award of custody to grandparents, then that award would infringe his rights under the Due Process Clause because grandparents have not shown that father is unable or unwilling to care for the children or that awarding custody to father will harm the children.

E.  *Construction of ORS 109.119*

Before we can evaluate the parties' competing positions, we first must construe ORS 109.119. We then can consider the facts in this proceeding in light of that construction.

■        The 2001 amendments to ORS 109.119 were intended to make that statute consistent with the due process requirements articulated in *Troxel*, but not to make broader changes in custody law.[9] Nothing in the text of the 2001 amendments or in the legislative history indicates that the legislature intended to make any change to the custody

_____

[9] Representative Lane Shetterly, who sponsored the legislation, stated the drafters' intentions before the House Judiciary Committee:

"What I would emphasize to the committee is that my charge to the work group, which I think they maintained very well, was that *our focus would be limited to addressing those issues raised by the Troxel case.* That is, we already had third-party visitation and custody in the Oregon statutes, uh, the *Troxel* case raised issues as to constitutionality under its analysis of the Washington statute. And so the charge to the work group which I think they held to very well, and so did the subcommittee, was that we would only deal with those issues raised by the *Troxel* case, and try not to get into re-debating the fundamental issues of third-party visitation, or trying to make changes in those statutes that went beyond the * * * issues raised by the *Troxel* case. *I would invite anyone to bring another bill to raise those broader issues, but this is one of these things we need to do, and so to get it done, we kept a very narrow focus.*"

Tape Recording, House Committee on Judiciary Work Session, Mar 30, 2001, Tape 30, Side A (emphasis added).

standard other than the protection of the parental right recognized in *Troxel*. Thus, as we examine ORS 109.119, we do so in view of the legislature's intent to meet the constitutional mandate of *Troxel*, which, as we discussed above, requires a court, in making custody or visitation decisions, to accord some special weight to a parent's determination of what is in the child's best interest. ORS 109.119(2)(a) purports to implement that mandate by establishing "a presumption that the legal parent acts in the best interest of the child." However, as discussed above and as permitted by *Troxel*, that presumption can be rebutted. ORS 109.119(3)(a) provides that, "if the court determines that the presumption * * * has been rebutted by a preponderance of the evidence, the court shall grant custody * * * to the person having the child-parent relationship, if to do so is in the best interest of the child."

The difficult issue in construing this statute is to determine how demanding the burden is on the nonparent to rebut the parental presumption. As noted, father's argument suggests that the nonparent's burden is a "heavy" one that can be met only by showing that a parent is unable to care for the child or will harm the child. Grandparents do not articulate any specific standard, other than to repeat the words of the statute, but suggest that the parental presumption "easily" can be rebutted by evidence of any one of the five nonexclusive factors listed in ORS 109.119(4)(b).

Such characterizations of the evidence to rebut the parental presumption are of limited utility. Rather than place any further adjectival gloss on the burden that an otherwise qualified nonparent must meet, we offer the following observations respecting the operation of the statute, in the hope that they will assist courts in applying the statute in future cases.

First, the legislature used the basic "preponderance of the evidence" standard for cases such as this, involving a custody petition by a nonparent who has a parent-child relationship with the child, while imposing the more demanding "clear and convincing evidence" standard when a person with an "ongoing personal relationship" seeks to overcome the parental presumption and obtain visitation or other rights regarding a child. ORS 109.119(3)(b).

Second, as previously discussed, the legislature specifically identified five factors that may be considered in determining whether the presumption has been rebutted. ORS 109.119(4)(b). By stating that those factors are nonexclusive and by including, as relevant factors, whether the nonparent recently has been the child's primary caretaker and whether the legal parent has consented to the relationship between the child and the nonparent, the legislature demonstrated that the parental presumption can be rebutted *without* a showing that the parent will harm the child or is unable to care for the child.

Third, the legislature could have imposed a more rigorous standard than the standard that we have read *Troxel* to require. However, as discussed above, the legislature declined to do so. That fact further supports the conclusion that the presumption can be overcome without showing that a parent is unable to care for the child or will harm the child. *Troxel* holds only that the Due Process Clause requires that "some special weight" be given to the interest of the legal parent, and nothing in the amendments to ORS 109.119 suggests that the legislature intended its use of the rebuttable parental presumption to impose a higher standard.

Finally, as previously discussed, we note that the consequences of a custody decision are less drastic, and the statutory requirements for such a decision correspondingly less exacting, than when the state petitions to terminate a parent's rights because the parent is "unfit" or to have a child determined to be within the jurisdiction of the juvenile court because the parent has failed to provide necessary care.

■ Accordingly, although we recognize the significance of the parental interest protected by the presumption embodied in ORS 109.119(2)(a), we nevertheless take the legislature at its word (as we must) when it determined that the presumption could be overcome by a showing, based on the preponderance of the evidence, that a parent does not act in the best interest of the child, and left to the courts as triers of fact the task of deciding whether the nonparents had made that showing in any particular case.

We therefore turn to the other critical issue of statutory construction in this case, namely, what evidence must

a nonparent seeking custody present to show that the legal parent does not act in the best interest of the child. We will discuss each of the five rebuttal factors listed in the statute when we review the evidence in this case. But we first must resolve the issue of whether evidence that supports less than all those factors—or other evidence not encompassed within the enumerated factors—is sufficient to rebut the statutory presumption.

■      Grandparents point out that the statute phrases the five rebuttal factors in the disjunctive, rather than the conjunctive. That phrasing suggests that, in an appropriate case, a court could conclude that the presumption was rebutted based on evidence of the existence of only one factor, provided that the court found, by a preponderance of the evidence, that the nonparent had overcome the presumption that the legal parent acts in the best interest of the child. There may be cases in which the parent is so obviously unwilling or unable to care adequately for the child that a court could conclude that the parental presumption was rebutted, despite the absence of evidence of any of the other four factors. Conversely, a nonparent may be able to present some evidence of each of the five enumerated factors and yet be unable to prove, by a preponderance of the evidence, that the legal parent fails to act in the best interest of the child. In specific cases, the weight to be given to each of the five statutory factors, to the evidence supporting those factors, and to other relevant evidence, will vary. The statutory touchstone is whether the evidence at trial overcomes the presumption that a legal parent acts in the best interest of the child, not whether the evidence supports one, two, or all five of the nonexclusive factors identified in ORS 109.119(4)(b).

This court has taken the approach set out above in construing other statutes in which the legislature has provided a nonexclusive list of factors for a court to consider in making a determination under the statute. In *Stillman*, for example, this court interpreted and applied ORS 419B.504, which describes the standard for determining when parental rights may be terminated because of parental unfitness. The statutory standard was whether the parent was "unfit by reason of conduct or condition seriously detrimental to the

child," and the statute provided that, in making that determination, the court was to consider six nonexclusive factors, including the parent's "emotional illness," "physical neglect of the child," and "criminal conduct that impairs the parent's ability to provide adequate care for the child." 333 Or at 144-45 (quoting ORS 419B.504). In construing that statute, this court stated:

> "[T]he legislature has provided a nonexclusive list of six examples of conduct and conditions that courts must consider, both in determining whether a parent is unfit and in determining whether the parent's disqualifying circumstances are not likely to change. But those statutory examples are just that—examples. The focus of that part of the statute is on the parent's conduct or condition."

333 Or at 146. Similarly, the focus of the statute here is not on whether one or more of the statutory factors are present, but on whether the evidence as a whole is sufficient to overcome the presumption that the parent acts in the best interest of the child.[10]

Father is probably correct that, ordinarily, a nonparent seeking to overcome the parental presumption will do so by proving that the parent is unable or unwilling to provide adequate care or that the parent is likely to cause harm to the child. However, nothing in the text of ORS 109.119 or in *Troxel* suggests that such proof is required for the nonparent to rebut the presumption that the parent acts in the best interest of the child.

## IV. APPLICATION OF ORS 109.119

We now consider the evidence in this case in light of our construction of the controlling statute. As noted, no party has argued to this court that grandparents have not established a "child-parent relationship," as defined in ORS 109.119(8)(a) (2001), with each child. The trial court found

---

[10] *See also State ex rel Juv. Dept v. Smith*, 316 Or 646, 652-53, 853 P2d 282 (1993) ("We therefore reject the proposition that any specific condition or circumstance *per se* does, or does not, establish the juvenile court's jurisdiction. We read ORS 419.476(1)(c) to require the juvenile court to consider the *totality of the circumstances* presented in the case before it. If, *after considering all the facts*, the juvenile court finds that there is a reasonable likelihood of harm to the welfare of the child, the court may take jurisdiction.") (emphasis added).

that they had established such relationships, and the Court of Appeals did not disagree. Accordingly, grandparents may seek custody of the children under ORS 109.119. Neither does any party argue that father is not a "legal parent" entitled to the presumption set out in ORS 109.119(2)(a) that he acts in the best interests of the children.[11] The parties disagree, however, as to whether the evidence at trial was sufficient to rebut that statutory presumption.

## A. *Findings as to the Rebuttal Factors*

■        The first rebuttal factor is whether the "legal parent is unwilling or unable to care adequately for the child." ORS 109.119(4)(b)(A). It should be obvious that, if a nonparent proves by a preponderance of the evidence that a parent is "unwilling" or "unable" to care for the child, the nonparent will have rebutted the presumption that the parent acts in the best interest of the child. However, consideration of this factor does not allow the court to substitute its judgment for that of a parent by determining that the nonparent is *better* able to care for the child. The legislature's use of the word "adequate" suggests that the parent must have the willingness and ability to provide something more than a bare subsistence level of care for the child, but that it would be inappropriate to compare a parent's "adequate" care with a nonparent's "more than adequate" care in considering this factor.

Here, grandparents assert that the evidence described above demonstrates that father is "unwilling or unable to care adequately" for the children. ORS 109.119(4)(b)(A). We disagree. Although grandparents claim that father's job and residential instability and other personal issues show father's shortcomings as a parent, those facts do not demonstrate that father is "unwilling" or "unable" to care adequately for the children as those terms are used in the statute. On the contrary, father plainly is willing

---

[11] We use the term "legal parent" because that is the term used in ORS 109.119(2)(a). That term includes, generally, biological and adoptive parents. *See* ORS 109.119(8)(e) (2001) ("legal parent" means parent as defined in ORS 419A.004 whose parental rights have not been terminated); ORS 419A.004(16) (defining "parent" as biological or adoptive mother of child and adoptive or "legal" father of child, and identifying circumstances in which biological father is "legal" father).

to care for the children, and the evidence at trial, including the report and testimony of the court-appointed psychologist, Vien, does not support grandparents' assertion that father is "unable" to provide "adequate" care.

Grandparents' argument that the "adequate care" factor favors their claim for custody boils down to the assertion that they are *better* able to care for the children than father is and that they will provide "better than adequate" care. Whether or not that claim is true, as to the rebuttal factor identified in ORS 109.119(4)(b)(A), only evidence that father is "unwilling or unable to care adequately" for the child is relevant in the process of determining whether grandparents have rebutted the presumption of parental fitness. *See also Troxel*, 530 US at 72-73 ("[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a judge believes a 'better' decision could be made."). We find that grandparents have not shown that father is "unwilling or unable to care adequately" for the children.

■ We next consider whether grandparents have shown that they "[are] or recently [have] been the child[ren]'s primary caretaker[s]." ORS 109.119(4)(b)(B). This factor focuses on the interest in continuity of caregiving and the relationship between the child and the nonparent seeking custody. As noted, grandparents had an unusually close and positive relationship with the children for many years, and mother and children (and, at times, father) lived with grandparents on occasion. After mother's death in March 1999, grandparents were the children's primary caretakers for more than three months. We find that grandparents have shown that they are or recently have been the children's primary caretakers.

The third factor identified in the statute is whether "circumstances detrimental to the child exist" if the relief sought by the nonparent is denied. ORS 109.119(4)(b)(C). In contrast to terms used in the other rebuttal factors, "circumstances detrimental to the child" is defined in the statute. ORS 109.119(8)(b) (2001). That definition states that the phrase includes, but is not limited to, "circumstances that may cause psychological, emotional or physical harm to a

child." Because the circumstances of living with father *may* cause such harm, grandparents assert, the evidence supports that rebuttal factor.

Father responds that this factor requires grandparents to show that the circumstances, if he retains custody of the children, would be *presently* detrimental to the children. He further argues that, if "detrimental circumstances" is defined in an open-ended way to include circumstances that *may* cause psychological, physical, or emotional harm to a child at some *future* time, that interpretation would reduce the showing required to rebut the parental presumption to a level that would be inconsistent with *Troxel* and essentially would reinstate a "best interest of the child" standard.

■ Father is correct that the statutory rebuttal factor of whether "[c]ircumstances detrimental to the child exist if relief is denied," ORS 109.119(4)(b)(C), by using the present tense of the verb "exist," focuses on whether *present* circumstances cause *present* detriment to the child. In comparison, the definition of that phrase in ORS 109.119(8)(b) (2001) appears to broaden the permissible inquiry to include circumstances that "may" in the future cause harm to the child. It also is true that, although the vast majority of parents seek to avoid physical harm to their children, life in almost any family includes circumstances that "*may* cause psychological [or] emotional * * * harm." ORS 109.119(8)(b) (2001) (emphasis added). Our task, of course, is to interpret the statute as the legislature intended, and we look first to the words that the legislature used. Examining those words, we conclude that "circumstances detrimental to the child," as used in ORS 109.119(4)(b)(C), refers to circumstances that pose a serious present risk of psychological, emotional, or physical harm to a child. We reach that conclusion because the purpose of that rebuttal factor, within the context of ORS 109.119, is to aid the finder of fact in determining whether a nonparent has overcome the presumption that the legal parent acts in the best interest of the child. That presumption would be almost meaningless if it could be overcome by evidence that the circumstances of living with a legal parent "*may* cause psychological, emotional, or physical harm to a child." Based on the text and structure of the statute, we conclude that the legislature intended that, to rebut the statutory presumption that

the legal parent acts in the best interests of the child by showing that "circumstances detrimental to the child exist if relief is denied," the nonparent must demonstrate that the circumstances of living with the legal parent pose a serious present risk of psychological, emotional, or physical harm to the child.

In support of that factor, grandparents again point to evidence of father's substance abuse and anger control problems and his relationship with Oliver, who also has substance abuse and anger problems and who lost custody of two of her own three children. They emphasize the trial court's finding that father has limited insight, lies whenever it suits him, is insensitive to the children's emotional needs, and would end the children's longstanding child-parent relationship with grandparents. They further argue that father leads an unstable life, with frequent changes of jobs and residences. They note that, during the approximately nine months that children lived with father during 1999 and 2000, the family lived at four different addresses and that, as a result, Taryn attended three different schools during his first year of elementary school. For those reasons, grandparents argue, "circumstances detrimental to the child[ren]" would exist if grandparents are denied custody.

Applying the standard that we articulated above, we find that grandparents have shown, by a preponderance of the evidence, that awarding custody to father would pose a serious present risk of psychological or emotional harm to the children. Based on the testimony of Vien and others, we find that father's lack of understanding of the children's emotional and developmental needs, his difficulty in controlling his own anger, and his lack of insight, considered together, pose a serious risk of psychological or emotional harm to the children. Father fails to recognize the emotional attachment that the children have to grandparents and other relatives of mother or the impact on the children of the family's changes of residence. Father was unable to acknowledge or identify a single possible shortcoming that he might have as a parent. Father similarly could identify no potential weakness that Oliver might have as a caregiver for the children, despite acknowledging her earlier marijuana and methamphetamine use, anger control problems, loss of custody of two of her

own children, and failure to complete a drug rehabilitation program. Vien stated that father likely would be "overwhelmed by the demands of single parenthood" and would need to rely on Oliver as a significant caregiver for the children. We find that Oliver's deficiencies as a caregiver, and father's complete failure to acknowledge any of them, both indicate a serious risk to the well-being of the children if father were granted custody.

As to grandparents' assertions that father's frequent changes of jobs and addresses demonstrate "circumstances detrimental" to the children, our conclusions require some elaboration. In our view, the fact that a parent changes jobs or addresses frequently does not demonstrate "circumstances detrimental to the child" that are sufficient to rebut the presumption in favor of the parent. Although, other things being equal, frequent changes of school and residence are not ideal for children, such changes are a fact of life for many families. A parent who serves in the military, works for a large corporation, or labors in the fields may be required to move often. Such moves do not necessarily indicate that the parent fails to act in the best interests of the children.[12] In this case, however, the evidence is different. Although some of father's testimony was contradictory, it is apparent that most of his changes of jobs and residences, as reflected in this record, were not required by financial, employment, or other external circumstances. Rather, the evidence shows that father's moves were choices that he made independent of the necessities of life as described above but, instead, usually because he wanted to leave behind problems or conflicts with other people. The trial court found, for example, that father's testimony that he moved to Montana for a "fresh start" showed a "lack of insight into how to constructively deal with problems." Moreover, father's moves during the time that he had custody of the children often were abrupt and undertaken with minimal planning or consideration of the interests of the

[12] This court made a similar point in refusing to terminate parental rights in *State v. McMaster*, 259 Or 291, 486 P2d 567 (1971). Despite finding that the family situation had some characteristics that also are present here (although to a lesser degree), including "transiency" and "instability," this court stated that parental rights could be terminated only by showing "a more serious and uncommon detriment" than was caused by the parents' conduct there. *Id.* at 303.

children. Accordingly, although we emphasize that a parent's frequent changes of jobs and residences, by themselves, do not tend to show "circumstances detrimental to a child," when, as here, the parent chooses to move often not because of employment or other external considerations but simply because of a desire to move, and the parent fails to consider the impact of the moves on the child, those moves can be relevant to the determination whether the parent fails to act in the best interest of the child.

Having reviewed the entire record, we find that circumstances detrimental to the children would exist if custody is granted to father.

The next rebuttal factor is whether the "legal parent has fostered, encouraged or consented to the relationship between the child and the [nonparent]." ORS 109.119(4)(b)(D). That factor recognizes that if a parent encouraged or approved of a longstanding pattern of contact or informal custody arrangements involving a grandparent or psychological parent, then the legal parent, at least at one point, apparently believed that that relationship was beneficial, or at least not detrimental, to the child.

Here, it is undisputed that father consented to the development over many years of a close relationship between grandparents and the children and that he agreed that children should live with grandparents in the immediate aftermath of mother's death. Father argues, however, that it would be unfair to him to permit his consent to allowing the children to live with grandparents during that time to be used to rebut the parental presumption. After all, father points out, he consented because he understood that he was not prepared on short notice to take custody of the children, and his consent properly could be seen as an action taken in the best interests of the children. At this point in the statutory analysis, however, we do not consider father's motives or intentions in consenting to the relationship between grandparents and the children, but only whether he, as the legal parent, encouraged or consented to it. We find that he did. As we discuss later, however, we agree with father that this factor should not be accorded any weight in rebutting the parental presumption in this case, because the fact that father consented to grandparents serving as primary caregivers and

otherwise having a close relationship with the children does not indicate in any way that he does not act in the best interests of the children.

■ The final rebuttal factor listed in the statute is whether the "legal parent has unreasonably denied or limited contact between the child and the [nonparent]." ORS 109.119(4)(b)(E). Like the factor just discussed, this factor focuses on the relationship between the child and a nonparent and, specifically, on the potential harm to a child's interest when a parent terminates or limits such a relationship. Grandparents argue that father "unreasonably denied or limited contact" between the children and grandparents, ORS 109.119(4)(b)(E), by moving the children with him and Oliver to Montana, in violation of a court order. The trial court, based on that action and the court's assessment of father's credibility in light of his trial testimony, stated, "Father's conduct convinces me that he will remove the children from this area if possible and will do all he can to eliminate contact between the children and the Grandparents." We agree.

Father argues that it is unfair to penalize him for limiting grandparents' contact with the children when grandparents also took steps to limit *his* contact with the children. He points out that, after the children spent two weeks with grandparents in July 1999, with father's consent, grandparents did not return the children to father. Instead, grandparents sought a court order *ex parte* contending that the children should remain with them. As noted previously, they obtained a court order, but it was vacated soon thereafter and the children were returned to father. Although father suggests that his conduct in taking the children to Montana was no different than grandparents' conduct in failing to return the children after the two-week visit and seeking a custody order, he is mistaken. Father left for Montana in violation of a court order, in breach of his promise to the trial judge, and without notice to grandparents or the court. Once in Montana, father refused to disclose his location and did not return the children until the court found him in contempt of court. We find that father unreasonably denied or limited contact between the children and grandparents.

## B. *Determination Whether Presumption Has Been Rebutted*

To summarize the discussion above, grandparents have shown that some, but not all, of the rebuttal factors are present in this case. We now consider whether the evidence here is sufficient to rebut the presumption that father acts in the best interests of the children. As we discussed above, our focus is not on specific factors but on whether, based on the totality of the circumstances, grandparents have rebutted the presumption that father acts in the best interests of the children.

In this case, we have found facts that support four of the factors, and we place particular emphasis on three of them: grandparents' role as primary caretakers to the children after mother's death; father's denial of contact between the children and grandparents by moving the children to Montana; and the risk to the children that granting custody to father will be detrimental to them.[13] ORS 109.119(4)(b)(B), (C), (E). First, grandparents were closely involved in the lives of the children for many years and stepped into the role of primary caretakers immediately upon mother's death; grandparents did not simply show up for the first time seeking custody after mother's death. Second, father's removal of the children to Montana not only prevented contact between grandparents and the children, but also violated a court order and father's in-court promise to a judge. Moreover, it significantly disrupted the children's lives, as discussed above. Finally, and most importantly, as to whether awarding custody to father would be "detrimental" to the children, we conclude that the evidence demonstrates that such an award would pose a serious present risk of psychological or emotional harm to the children. The statute requires us to examine whether the evidence in support of each identified factor (and any other evidence relevant to rebutting the presumption), when taken as a whole, rebuts the presumption. ORS 109.119(3)(a). Considering all the evidence, we conclude, on *de novo* review, that grandparents have rebutted,

---

[13] Although we have found that father consented to grandparents' role as primary caregivers after mother's death, for the reasons discussed previously, 337 Or at 115-16, we conclude that, in this case, that fact is not evidence that rebuts the presumption that father acts in the best interests of the children.

by a preponderance of the evidence, the presumption that father acts in the best interests of the children.

## C. *Consideration Whether Awarding Custody to Grandparents is in Best Interests of the Children*

Based on our finding that grandparents have rebutted the parental presumption, the statute provides that we "shall grant custody" to grandparents "if to do so is in the best interest of the child[ren]." ORS 109.119(3)(a). Making that determination is a separate statutory inquiry from whether the presumption that the parent acts in the best interest of the child has been rebutted under ORS 109.119(4)(b). Here, however, we have explored the evidence in the record thoroughly in our discussion above, and it would serve no purpose to review that evidence again. It is sufficient to state that we conclude, based on the evidence in the record, that granting custody to grandparents is in the children's best interests.

## V. FATHER'S CONSTITUTIONAL ARGUMENTS

Our conclusion that granting custody to grandparents is in the children's best interests does not end our inquiry, however, because father argues that, applied in this manner, ORS 109.119 violates his state and federal constitutional rights. We begin with father's state constitutional argument.

## A. *Father's State Constitutional Argument*

Although father does not argue that ORS 109.119 is facially unconstitutional, he does assert that, if the statute is applied so as to deny him custody here, then that application of the statute would violate the "remedy clause" of Article I, section 10, of the Oregon Constitution, which provides that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation."[14] In reaching that conclusion, father relies upon cases in which this court has held that the remedy clause prohibits the state from eliminating a common-law cause of action for injury to a

---

[14] Article I, section 10, provides:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

right protected by Article I, section 10, unless the state provides a constitutionally adequate substitute. However, father's advocacy falls far short of demonstrating how any "remedy," as that term is used in Article I, section 10, is implicated at all by the legislative choice embodied in ORS 109.119. We therefore do not address the subject further.

## B. *Father's Federal Constitutional Argument*

We now turn to father's federal constitutional argument. As we noted at the outset, father does not argue that ORS 109.119 is unconstitutional on its face. He does claim, however, that the statute is unconstitutional in its application unless the evidence introduced to rebut the statutory presumption that a parent acts in the best interests of the child demonstrates that the legal parent is *unable* to care adequately for the child or that custodial placement with the legal parent will *harm* the child. That is so, father argues, because *Troxel* holds that the Due Process Clause requires that "at least some special weight" be given to a fit parent's determination of what is in the child's best interest. 530 US at 70. Father asserts that, if the statute allows the constitutional "presumption that fit parents act in the best interests of their children," *id.* at 68, to be rebutted by evidence short of demonstrating either present harm to the child or the parent's inability to care for the child, then that application of the statute violates the parent's due process rights.

Father certainly is correct that ORS 109.119, as we have interpreted it above, permits the presumption that the legal parent acts in the best interest of the child to be rebutted by evidence that does not rise to the level of showing that the legal parent is *unable* to care for the child or that granting custody to the legal parent *will cause harm* to the child. That is the state of the evidence in this case. Father is wrong, however, in arguing that *Troxel* requires some showing beyond that made by grandparents in this case.

As our earlier discussion of *Troxel* demonstrates, that case does not sweep as broadly as father asserts. *Troxel* specifically declined to address the so-called "harm" standard, and it also failed to articulate an "inadequate care" requirement. Rather, the due process right that the Supreme

Court affirmed in *Troxel* is important, but limited: a court may not override a parent's decision about the care or custody of a child simply because the court determines that the decision is not in the child's best interest, as the trial court did in *Troxel* regarding a grandparent's interest in visitation. Instead, the court must presume that a fit parent's decision is in the best interest of the child, and the court may reach a decision contrary to the wishes of the parent only if there is evidence sufficient to overcome that presumption. *Troxel* goes no further.

*Troxel* does require the state to give "some special weight" to the interest of a parent in decisions regarding a child. ORS 109.119, as we have interpreted and applied it here, responds to that mandate and appropriately protects father's due process rights. In our factual findings and legal conclusions, we have followed the statute and presumed that father acts in the best interests of the children. We have considered a petition by grandparents who have the status, under the statute, of psychological parents. We have examined factors reasonably identified by the legislature as relevant to making a custody decision, and we have concluded, by a preponderance of the evidence, that the evidence in support of those factors overcomes the presumption that father will act in the best interests of the children. Father received the deference to his due process rights that *Troxel* requires. For the foregoing reasons, we award custody of the children to grandparents, with parenting time, as determined by the trial court, to father.

Finally, we pause to recognize the limitations of the appellate process in dealing with cases of this kind. As we noted at the outset, we have reviewed the record *de novo* and also have determined (with the parties' agreement) not to remand to the trial court for additional development of the record. We have done so, in large part, because of the need for finality in this case. That important consideration, however, carries with it the consequence that we have reviewed a record that now is three years old. The children certainly have changed during that time, and the lives of father and grandparents also may have changed in ways that, if part of the record, would cause us to view some of the issues in this case differently than we have. But that unfortunate temporal

handicap of appellate decisionmaking does not diminish the need for a final resolution to these proceedings, which this disposition provides.

The decision of the Court of Appeals is reversed, and the judgment of the circuit court is affirmed.