Argued and submitted April 5, affirmed May 29, 1996

In the Matter of the Marriage of

Elizabeth C. KINGSBURY,
*Respondent,*

*and*

Alton T. KINGSBURY,
*Appellant.*

(D9003-61802; CA A82880)

917 P2d 1055

Richard D. Cohen argued the cause and filed the brief for appellant.

Stephen E. Andersen argued the cause and filed the brief for respondent.

Before Deits, Presiding Judge, and De Muniz and Armstrong, Judges.

DE MUNIZ, J.

## DE MUNIZ, J.

Father appeals the modification of his dissolution judgment that suspended "indefinitely" his visitation and contact with his daughter. We affirm.

The underpinnings of this proceeding involve the alleged sexual abuse of daughter by father. Father and mother were married in 1982, and daughter was born in 1983.[1] After the parties separated in early 1990, father had visitation with daughter one evening each week and every other weekend. In May 1990, mother became concerned when daughter returned upset after a weekend visit with father and complained of pain in her groin. Daughter's pediatrician referred her to Emanuel Hospital's Child Abuse Response and Evaluation Services (CARES) program. No conclusive diagnosis of abuse could be made based on the physical examination of daughter, and CARES referred daughter to Dr. Shelby, a child and family psychiatrist, who saw daughter eight times. Daughter never disclosed any abuse to Shelby, who was unable to resolve the issue.

In the June 1991 dissolution judgment, the parties stipulated to supervised visitation by father with daughter. The judgment recited that the "court makes no finding either way regarding allegations of abuse of the child." The judgment also provided that daughter, mother and father were to begin therapy with Dr. Eastman with a goal "to improve the father-daughter relationship so that normal visitation may result[.]"

Beginning in April 1991, Eastman worked with the family for a year. Although Eastman had some concerns that daughter had been abused, she did not form a conclusive opinion that she had. Eastman testified that daughter knew that there had been physical evidence of possible abuse and that daughter was troubled that she could not remember what had happened or whether her father or someone else was involved.[2] Daughter made no disclosures to Eastman. Eastman found that the mistrust and suspicion between the

---

[1] Both parties have children from previous marriages.

[2] Father's psychosexual evaluation was inconclusive.

parents was "extremely pronounced" and that the continuing personal and legal conflicts of father and mother prevented progress by embroiling daughter in her parents' turmoil. Eastman discontinued the therapy because she did not believe that there was movement toward unsupervised visitation, and she was also having difficulty with father's attendance at therapy. At the time that Eastman stopped working with the family, daughter wanted visitation to continue.

In December 1992, daughter began therapy with a third counselor, Rita Stratton, a licensed clinical social worker. Before meeting with daughter, Stratton interviewed mother, who told Stratton that she believed that father had sexually abused daughter. Stratton testified that she began therapy with the assumption that daughter had been molested but denied that she assumed that daughter had been molested by her father. Her therapy included playing tapes of "therapeutic stories,"[3] and she also played a tape of a child talking about her actual recollections of abuse by her father. In March 1993, following these sessions, for the first time daughter made statements that father had abused her. There was expert testimony that Stratton's therapy had contaminated daughter's disclosure.[4]

Following the disclosure, Stratton recommended to mother that supervised visitation stop, and mother followed Stratton's advice. Father then filed a motion to show cause as to why mother should not be held in contempt for denying visitation, and mother filed a motion to show cause why the

---

[3] Stratton testified about one story by way of example: A happy puppy went into the woods and was not, when she returned, the same. The puppy would not talk about what had happened because she had had an "invisible magic bandage" put over her mouth and couldn't talk. One day the puppy discovered that she had been lied to and that she didn't have an invisible bandage. She talked and felt better and happy again.

[4] Dr. Charlene Sabin, a physician in behavioral pediatrics, testified:

"* * * Clearly a tape about a little girl disclosing sex abuse about her father is contamination. The tape about the bandaid and the forest is — it's kind of interesting. I suppose you could look at that in a number of different ways. It may not be clearly contamination. But if told in conjunction with the daddy tape, those two things together, I think, are clearly contamination. Also, the part about — that you must have something to tell, I mean, not everybody who comes to therapy has something to tell. And I think they're both contamination. I think the daddy one is pretty amazing, clearly contamination."

dissolution judgment should not be amended to make a finding that father had sexually abused daughter and to suspend visitation.

After a lengthy hearing,[5] the trial court held:

"This is a very sad and difficult case; and there are credibility problems all throughout this case as far as both the parents are concerned and as far as [daughter's] testimony is concerned.

"Whatever happened, if anything happened, was several years ago. A lot has happened in between.

"The process of getting to where we are now has not been pretty since the time of the dissolution, and I think a lot has happened to [daughter] that has contaminated her in some respects in terms of her ability to understand and relate, because what she relates could not have happened, in my opinion, exactly as she related it.

"I believe that [mother] genuinely believes that [daughter] has been molested and acted solely out of what I think are appropriate motives—notwithstanding some mistakes in judgment—appropriate motives to protect her daughter.

"[A]n easy finding to make is that [daughter] genuinely believes that she has been molested. There is no doubt about that. And in that sense, her credibility is fine. Do I believe it? * * * Do I believe by a preponderance of the evidence that [father] has molested [daughter]? That means 51 percent, I guess they say. I do not. There is too much garbage in the whole evidentiary sequence to be able to say by what to me is 51 percent that that has happened. On the other hand, I believe there is a substantial likelihood somewhere short of 51 percent that that has occurred. * * *

"Whether [daughter] has been molested or not is not really the issue anymore, and I think most of the professionals who have testified here, and there were six or seven of them, recognize that. The belief that [daughter] holds plus all the other things that are going on kind of leave you in the same place that you have to deal with her belief and not with the actuality, whatever it may be."

---

[5] Daughter was 10 years old at the time of the hearing.

The court found that forcing daughter to visit was not beneficial to her at this point. However, the court declined to impose a plan of therapy, concluding that it did "not have the tools to get into people's heads and make them succeed in therapy." It held that it had no alternative but to suspend visitation "pending further development[.]"

 Father's first assignment of error challenges the suspension of visitation. He contends that indefinitely suspending his right of contact with his daughter is a *"de facto"* termination of his parental rights.[6] In a judgment of dissolution, the court has the power to decree

> "[f]or visitation rights of the parent not having custody of such children * * * the issue of visitation in the best interest of the child, insuring the non-custodial parent sufficient access to the child to provide for quality parenting time. The court shall recognize the value of close contact with both parents and encourage, where practical, joint responsibility for the welfare of such children and extensive contact between the minor children of the divided marriage and the parties." ORS 107.105(1)(b).[7]

 Our review is *de novo*. We agree with the trial court that the evidence does not prove that father sexually abused daughter. The physical and psychological evidence does not establish abuse by a preponderance of the evidence, and daughter's testimony as to the how the abuse occurred and its frequency is not believable. However, we also agree with the trial court that both mother and daughter firmly believe that father abused daughter. In *Cohen and Cohen,* 89 Or App 12, 747 P2d 363 (1987), *rev den* 305 Or 331 (1988), confronted with the analogous situation, we declined to order visitation. We held:

> "A noncustodial parent's right to visitation is not absolute. The best interests of the child are paramount. In this case, the child was convinced that she had been molested, and she showed adverse emotional reactions to visits with father. Whether the child's psychological problems were produced by mother's instigation or father's conduct, the

---

[6] Father has not seen his daughter for three years.

[7] The legislature has not provided a different standard when visitation is modified. *See* ORS 107.135.

child is still suffering and needs additional therapy. We agree with the trial court that suspension of visitation is appropriate." *Id.* at 15.

In *DeSantis and DeSantis*, 109 Or App 76, 817 P2d 769 (1991), we reaffirmed that the best interests of the child may require suspending visitation. In *DeSantis*, the father had not shown that he could provide a safe environment for visitation. We held that a primary concern in visitation is the best interest of the child and that,

"[a]lthough ORS 107.105(1)(b) also requires the court to recognize the value of parental contact, the child's welfare must be accorded greater weight in the balance." *Id.* at 79.

Father argues that his situation is distinguishable. He contends that in *DeSantis* the father was unfit because he had not made progress in treatment for alcohol and drug problems. He contends that, in *Cohen*, unlike here, the judgment provided specifics that would constitute a change in circumstances that gave the father something to work towards to achieve future visitation.[8]

Father contends that here the court's statements and order make it clear that the "further developments" will require that either (1) he confesses to something that he has not done and was not proved; or (2) that daughter, despite currently being in therapy with a therapist hostile to father, somehow makes progress that will make her amenable to contact with father; or (3) that daughter somehow otherwise becomes amenable to contact with father, regardless of the hostility of mother towards father. The thrust of father's position is that it is highly unlikely that any of those developments will occur and that, by linking future visitation to them, the real result of the court's order is to terminate his basic right to a relationship with his daughter.

---

[8] In *Cohen*, the judgment provided that visitation was denied

" 'until there is substantial change of circumstance [*sic*] in all of the three following areas:

" '(1) The emotional difficulties of the child; and

" '(2) The emotional makeup of the [father]; and

" '(3) The deficits in parental skills as exemplified by the [father].' " *Cohen*, 89 Or App at 14 (brackets in original).

██ We once again reaffirm that the primary concern in establishing visitation is the best interest of the child. Here, no one, including father, argues that it is in the best interest of daughter to reestablish visitation immediately. However, the record shows that the best interest of daughter would be served by ending the focus on whether abuse occurred and working towards a relationship with both parents. Sabin testified:

> "[I]t's time to get off the focus of whether or not sex abuse occurred and figure out how to get on with the child's life.
>
> "\* \* \* \* \*
>
> "I don't think we can figure [the sexual abuse] out. I think— I think there's been so much water under the bridge, so much contamination, so much time has passed over time, there's so much emotional investment in this, the little girl has already gotten polarized. I think it's the most professional thing to do is to say 'I don't know.' And I think professionals have to be willing to say that sometimes rather than to get polarized. And now is the time because this little girl needs to have a relationship with both parents, and it's important to her development. Studies have shown that the belief that you have been sexually abused is just as harmful as being sexually abused. And being estranged from a parent is certainly a great loss."

The conundrum is how to reestablish the father-daughter relationship. Mother does acknowledge that, perhaps with time and therapy, father and daughter might reunite, but that "without a concrete plan on the table the court would be out of its realm to suggest, much less order, any therapeutic program." However, mother has obtained what she wants by suspending visitation and offers no plan. Father argues that "reasonable conditions" should be in place by which he can obtain future contact with daughter but does not outline what those are. Although father testified that he was willing to work with a therapist for daughter if he "had a reasonable basis to believe that the person was fair and unbiased," the record shows that his perception of "fairness" is heavily dependent on the therapist's analysis of his problems.[9]

---

[9] For example, father testified:

At the hearing, daughter's counsel urged the court to appoint a neutral therapist, and the record shows that there are "neutral" therapists and programs available. However, the trial court declined to order that therapy, and so do we. In the juvenile court setting, both the child and the parents are subject to specific provisions requiring treatment. *See* ORS 419B.352 (court may direct child in jurisdiction of court to be examined or treated by psychiatrist or psychologist); ORS 419B.387 (if court finds treatment needed by parent to correct circumstances that brought child within its jurisdiction, court may order parent to participate in treatment). However, even assuming that our equitable powers under ORS 107.405 also authorize us to order the family to participate in treatment, we will not require the parties to do so here when they have not consented to participate.[10] Rather, we reluctantly agree with the trial court that such an order would be futile in the face of the intractable positions and mutual hostilities that are present here in the parties and daughter.

---

"Q [By mother's counsel] [A]fter the initial evaluation from Dr. Shelby [concerning daughter] when she issued her letter in July of 1990, you expressed concern that you didn't want to cooperate with further evaluations with Dr. Shelby; correct?

"A [Father] I had concerns about Dr. Shelby. I didn't give an ultimatum.

"Q But you didn't really want to go back in and visit with your daughter and Dr. Shelby together, did you, in the fall of 1990?

"A That was difficult.

"* * * * *

"Q Well, you felt that Dr. Shelby was biased towards you, didn't you?

"A That would be one way of saying it.

"Q And you also testified today that you also didn't like Dr. Eastman, either, did you?

"A Now ask that question again, please.

"Q You testified earlier that you were uncomfortable with Dr. Eastman because of the way she treated your alcohol problem and the way she dealt with Dr. Maletzky's report [regarding sexual offending].

"A Yes, I was uncomfortable with that.

"Q So you were unhappy with Dr. Eastman, also?

"A Yes."

[10] In the domestic relations setting, although both parents are encouraged to share in the "rights and responsibilities of raising their children," ORS 107.149, the authority of the noncustodial parent to determine treatment is circumscribed by the right of the custodial parent. ORS 107.154(4) provides that an order of sole custody does not deprive the other parent of the right to authorize psychological care "if the custodial parent is, for practical purposes, unavailable[.]"

However, we reject father's position that, because the order does not spell out "specifics" as did the judgment in *Cohen*, the order in effect terminates his parental rights. It is clear in the trial court's colloquy that future developments could provide a basis for visitation. Furthermore, we do not agree that the circumstances outlined in the *Cohen* judgment, *see* note 8, were "specific," and here the specifics that the parties need to address are evident from the proceedings.[11] For example, the evidence shows that each party's hostility towards the other interferes with the daughter's best interest. Nothing precludes either party from working independently to overcome that hostility. Furthermore, mother has an obligation not to interfere with or deny father his right to visitation without good cause. ORS 107.431(1)(d). A showing of progress on father's part in preparing for successful visitation carries the corresponding obligation of mother being able to demonstrate that she is working toward overcoming her antagonism and is assisting daughter in reaching that goal. In other words, the responsibility rests squarely on father and mother to put their conflict behind them[12] and work for the best interest of their daughter.

Father also assigns error to the trial court's finding that mother did not intentionally alienate the affections of daughter from father. Our *de novo* review shows that the trial court did not err.

Affirmed. No costs to either party.

---

[11] We reject father's contention that he has jumped through all the "hoops" already and that the trial court's order requires that he admit to sexual abuse. However, a future showing of a change in circumstances might well require another sexual offender evaluation. For example, Sabin testified that, in the context of structuring a visitation, a sexual abuse evaluation and lie detector test "and things like that" would be required.

[12] That conflict was perhaps best demonstrated by testimony that, during one supervised visitation, mother and father had a verbal argument and "one parent had one arm [of daughter] and the other the other arm pulling her apart."