Argued and submitted April 6, affirmed in part; otherwise reversed and remanded with instructions September 15, 1999

Annette M. FREDERIKSEN,
aka Annette M. Whitlock,
*Appellant,*

*v.*

Fred OSTERMEIER, Jr.,
*Respondent.*

(98-3119; CA A103109 (Control))

Fred OSTERMEIER, Jr.,
*Respondent,*

*v.*

Annette M. FREDERIKSEN,
*Appellant.*

(97-3375; CA A103228)

In the Matter of the Guardianship of
Jeremy Thomas Ostermeier, a Minor Child.

Annette M. FREDERIKSEN,
*Appellant,*

*v.*

Fred OSTERMEIER, Jr.,
*Respondent.*

(P97-081; CA A103229)
(Cases Consolidated)

986 P2d 1194

Michael S. Evans argued the cause for appellant. With him on the brief was Evans & Zusman, P.C.

No appearance for respondent Fred Ostermeier.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Maternal grandmother (Frederiksen) appeals from a judgment in a consolidated proceeding to establish paternity, guardianship and custody of Jeremy, the three-year-old son of Frederiksen's deceased daughter (Andrea). We review *de novo*, ORS 19.415, and reverse the judgment as to the guardianship and custody of Jeremy.[1]

Jeremy was born in 1995. His mother, Andrea, and his father never married. Andrea resided with her mother, Frederiksen, during the latter half of her pregnancy and until her death in 1997.[2] Frederiksen is 45 years old, married, and manages an apartment house. She is also a certified day care provider. According to Frederiksen, she essentially "mothered" her daughter Andrea and Andrea's two children, Jordan and Jeremy, until Andrea's death.[3]

Frederiksen testified that she and Andrea were "joint caretakers" of Jeremy and that she and Jeremy had developed a "very close, loving relationship" before her daughter's death. Even before Andrea's death, Frederiksen regularly fed and bathed Jeremy, took him to the doctor, played with him and took him shopping and other places. During the period between Jeremy's birth and Andrea's death, Frederiksen and Jeremy were separated only briefly when Frederiksen resided out of state for two or three months.

Dr. Birney, a psychologist engaged to evaluate the relationship between Jeremy and Frederiksen, described Jeremy as a "very comfortable child" who was emotionally connected and clearly bonded to Frederiksen. Birney opined that the bonding had occurred before Andrea's death and that, because Frederiksen had also been a primary caretaker,

---

[1] On appeal, Frederiksen does not challenge the finding on paternity. Although father appeared and was represented in the proceedings below, he has not filed a brief on appeal.

[2] Although Andrea and her children occupied a separate apartment at some point, the record indicates it was an adjoining apartment that shared a common entry door.

[3] Jordan is Andrea's child from another relationship. After Andrea's death, Jordan lived with his paternal grandparents.

"Andrea's death may not have had as significant an impact on Jeremy as would otherwise be the case." He also testified that Jeremy's bonding with Frederiksen provided a sense of security in Jeremy's life and had served to lessen the traumatic impact of his mother's death. Birney concluded that, "if Jeremy was moved from Frederiksen's home, there was a better than 50% chance that Jeremy's emotional development and adult adjustment would be compromised, in terms of difficulty in forming relationships later in life and in anxiety in the child at the time of disruption."

Until just before Andrea's death, father had not acknowledged paternity of Jeremy and had provided no formal support for the child.[4] Father has been arrested for driving while revoked and assaulting a police officer and, at the time of the hearing, was on probation for possession of a controlled substance. Evidence indicated that father used methamphetamine in front of another one of his sons. Father testified that he had been treated for his drug addiction at Serenity Lane and claimed to be "clean and sober" since that treatment.

The testimony about father's contact with Jeremy before Andrea's death is conflicting. Witnesses called by Frederiksen described father's contact as intermittent and indicated that father paid little attention to Jeremy before Andrea's death. Father characterized his relationship with Andrea as a "come and go type thing" and indicated that he spent "an average of 50% of the overnights with Andrea give or take." Father testified that, before Andrea's death, he took Jeremy out "a couple of times." Camberg, the mother of another of father's children, testified that father is "an excellent" father to her son. However, she also recalled an incident in which father "beat her up" in front of that child and had to be taken to jail. Father and his son by Camberg share a room in father's parents' home. Father's testimony did not reveal whether he planned any other living arrangements if he were

---

[4] There is testimony in the record that father had provided automobiles for Andrea to drive, although she did not have a driver's license. A witness called by father testified that she saw Andrea with cash that the witness believed had been given to Andrea by father. Father testified that he wrote checks for $250 to $300 per month to Andrea. However, father failed to bring the canceled checks to the hearing.

awarded custody of Jeremy. Father testified that, if given custody of Jeremy, he first planned to take Jeremy on a month-long vacation to Mexico.[5] According to father, he hoped to have a "significant other" babysit Jeremy while he was at work.

On appeal, Frederiksen contends that, even under the "compelling reasons" standard, the court erred in awarding custody to father. When she filed her brief in this court, Frederiksen did not assign error to the trial court's use of the "compelling reasons" standard, *see Hruby and Hruby*, 304 Or 500, 748 P2d 57 (1987), in its determination of custody. However, in *Sleeper and Sleeper*, 328 Or 504, 982 P2d 1126 (1999), and *Moore and Moore*, 328 Or 513, 982 P2d 1131 (1999), decided after the trial in this case and after the filing of Frederiksen's brief, the Supreme Court held that the legislature, in amending ORS 109.119(2)(a), intended that courts use the "best interest of the child" standard in resolving custody disputes between a biological parent and a person with child-parent relationship with the minor child whose custody is at issue. Accordingly, because we review *de novo*, we apply the "best interests of the child" standard in determining whether Jeremy's custody should be with father or with Frederiksen.[6]

---

[5] We have reviewed father's testimony in an attempt to determine what living arrangements father intended to provide for Jeremy. There is nothing in father's testimony about that, only that he and his son with Camberg share a room in father's parents' home.

[6] Generally, in determining the best interests of the child for custody purposes, we consider:

"(a) The emotional ties between the child and other family members;

"(b) The interest of the parties in and attitude toward the child;

"(c) The desirability of continuing an existing relationship;

"(d) The abuse of one parent by the other; and

"(e) The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. However, the court may not consider such willingness and ability of one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child."

ORS 107.137(1). No one factor is dispositive. ORS 107.137(2).

The trial court found that "[Frederiksen] has bonded with the child." Our review of the record convinces us not only of the correctness of that finding but that, indeed, a very strong child-parent relationship exists between Jeremy and Frederiksen and that that relationship preexisted Jeremy's mother's death. We also conclude that Jeremy's relationship with Frederiksen has provided a sense of security necessary to Jeremy's emotional development and well-being.

Our extensive review of the record also convinces us that father was generally indifferent emotionally toward Jeremy before mother's death. We base that determination on father's failure to acknowledge or participate in a determination of paternity until just before Andrea's death, his failure to pay some form of formal support, and his sporadic or barely intermittent contact with Jeremy during the first two-and-a-half years of Jeremy's life. We also find that father's criminal history, his violence against the mother of his other child, and his living situation demonstrate that he lacks the ability to provide the kind of stabilizing and nurturing environment Jeremy needs, particularly now after the loss of his mother.

Finally, Birney testified that, because of the strong bond between Frederiksen and Jeremy and the security that relationship provides to Jeremy, removing Jeremy from Frederiksen's full-time care would cause Jeremy significant anxiety and would negatively impact Jeremy's emotional development even into adulthood. Nothing in the record refutes Birney's assessment, and we agree with it.

It does appear that father, with the death of Jeremy's mother, is now intent on having a father-son relationship with Jeremy. However, after considering the entire record and weighing the factors outlined in ORS 107.137(2) as applicable here, we conclude that it is in Jeremy's best interest that he be placed in Frederiksen's custody.

Judgment as to father's paternity affirmed; reversed and remanded with instructions to enter judgment granting Frederiksen's petitions for guardianship and custody of Jeremy. On remand, the trial court shall determine father's child support obligation and reasonable parenting time for father.