Submitted on record and briefs January 2, reversed and remanded with instructions June 30, petition for review denied October 26, 2004 (337 Or 555)

## Karen MEADER
### and Harry Meader,
*Respondents,*

*v.*

## David MEADER
### and Alice Meader,
*Appellants.*

## 00C-33824; A120628

94 P3d 123

David Meader and Alice Meader filed the briefs *pro se* for appellants.

Lance D. Youd filed the brief for respondents.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

ORTEGA, J.

**ORTEGA, J.**

Parents appeal from an order denying their request for modification of a judgment awarding substantial visitation to paternal grandparents. Because the trial court determined that there was no substantial change in circumstances to require modification of the original judgment, it did not address the children's best interests. We review *de novo*, ORS 19.415(3) (2001),[1] and reverse, concluding that the best interests of the children require termination of the visitation.[2]

We begin with a review of the history of this proceeding, which provides the context for our decision regarding modification. This proceeding involves the three oldest of parents' four children—their daughter, C, who was born in July 1995, and their two sons, T and M, who were born in April 1997 and October 1998, respectively.[3] Grandparents' original petition for visitation was heard in April 2001, when C was almost six years old and T and M were ages four and two. Grandmother apparently sought visitation under *former* ORS 119.121 (1999), *repealed by* Or Laws 2001, ch 873, § 2.[4] Because grandfather is father's stepparent, he apparently sought visitation under ORS 109.119 (1999).[5] Grandparents

---

[1] The legislature amended ORS 19.415(3) in 2003, but those amendments do not apply to this case. *See* Or Laws 2003, ch 576, §§ 88, 90a.

[2] Given this disposition, we decline to address parents' second assignment of error regarding alleged bias of the trial judge. Additionally, in the order that is the subject of this appeal, the trial court awarded grandparents attorney fees. In light of our disposition, that award is reversed as well. *See* ORS 20.220.

[3] Grandparents have not petitioned for visitation with the youngest child, who was born while the modification proceeding was pending.

[4] *Former* ORS 109.121(1)(a) provided, in pertinent part, that a grandparent was entitled to petition for "reasonable rights of visitation" if:

"(A) The grandparent has established * * * ongoing personal contact with the child; and

"(B) The custodian of the child has denied the grandparent reasonable opportunity to visit the child."

Additionally, any visitation order was to be made "according to the court's best judgment of the facts * * * guided by the best interests and welfare of the child." *Former* ORS 109.121(5).

[5] ORS 109.119 (1999) provided for an award of visitation to a person with an "ongoing personal relationship" with a child based on clear and convincing evidence that visitation was appropriate and in the best interests of the child. *See also former* ORS 109.121(7)(a) (providing that *former* ORS 109.121 does not apply to stepgrandparents).

sought weekly eight-hour visits and one overnight visit per month, claiming that they had been regular caretakers of the children and had developed emotional ties with them. They contended that parents had begun denying visits after grandparents became critical of their efforts at parenting. Apparently, on more than one occasion, grandparents had called the sheriff and lodged complaints with the State Office for Services to Children and Families (SCF)—now known as Department of Human Services (DHS)—regarding concerns that parents were mistreating the children. Grandparents claimed that parents slapped the children in the face and pulled their hair, used profanity around them, and locked C in her room when she misbehaved.

Parents admitted to spanking the children but denied slapping them in the face or pulling their hair, and mother explained that she had locked C in her room, in accordance with advice from parenting tapes, when C's behavior was out of control. Parents noted the lack of any evidence of abuse (particularly given the regularity with which grandparents photographed the children), and the record indicates that DHS never took custody of the children despite investigating parents at grandparents' behest. Parents claimed that grandparents undermined them (particularly mother) as parents, including in front of the children, and that C was often defiant and difficult to manage after spending time with grandparents. Parents disputed the extent of grandparents' past contact with the children and contended that they had not denied visits but had merely insisted that any visits must occur in father's presence.

Grandparents' petition was heard several months after the United States Supreme Court's decision in *Troxel v. Granville,* 530 US 57, 66, 120 S Ct 2054, 147 L Ed 2d 49 (2000), in which a majority of the justices agreed that the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." The same justices agreed that, under the circumstances of that case, the state court's decision to

---

Although this case involves a grandparent and a stepgrandparent, for purposes of this opinion, we refer to them collectively as grandparents.

override the parent's reasonable choice to limit grandparent visitation merely because that visitation was found to be "in the best interest of the children" impermissibly infringed on that fundamental right. *Id.* at 67-69. We addressed the impact of *Troxel* in *Harrington v. Daum,* 172 Or App 188, 198, 18 P3d 456 (2001)—also decided before the hearing on grandparents' petition—explaining that "*Troxel* now establishes that the court must give significant weight to a fit custodial parent's decision" regarding visitation and that a parent's right to make decisions concerning the child's upbringing is "a supervening right that both affects the determination of whether visitation is appropriate and prevents the application of solely a 'best interests of the child' analysis."

Although the trial court in the hearing on grandparents' original petition did not conclude that parents were unfit, there is no indication that the court considered *Troxel* or applied any kind of presumption in favor of parents' decision to limit grandparents to visits under father's supervision. Instead, the court found that parents had denied grandparents a reasonable opportunity to visit with their grandchildren—a finding that was relevant only as to grandmother, because grandfather is father's stepparent[6]—and found that it was "in the best interest and welfare of the children" that grandparents be awarded "parenting time." Specifically, the court indicated that it would award grandparents two overnight visits per month with the children.

Before entry of the trial court's judgment in May 2001 and without apprising the trial court, parents moved the family to Wyoming. Parents did not appeal the court's judgment. Soon after parents' departure, grandparents obtained an order to show cause why parents were not in contempt of the judgment. The case was reassigned to a new judge; the order was served only on mother and, when she failed to appear, grandparents sought and obtained a warrant for mother's arrest from the judge newly assigned to the case. Mother was arrested and spent three days in jail in Wyoming in late December 2001.

---

[6] *See* 194 Or App at 33-34.

By April 2002, parents had moved back to Oregon and filed a motion to modify the visitation order to terminate grandparents' visits or, in the alternative, to allow only supervised visits. Parents both appeared at a hearing in May 2002 and acknowledged that they were in contempt of the original judgment. At that hearing, father presented by affidavit evidence that, in January 2002, while the family was still in Wyoming, C had disclosed to mother that grandmother had sexually abused her. Father brought C to Salem to be interviewed at Liberty House later in January. During an in-depth interview, C disclosed that, on one occasion when she was five years old, grandmother had touched C's genitals with her hand and instructed her to tell the police that her "grandpa" (apparently indicating C's maternal grandfather) had done it. C reported that grandmother had indicated that she was going to hurt C and give her to the police if she did not listen to grandmother and say what grandmother told her to say. Liberty House staff assessed the interview as credible evidence of sexual abuse and recommended that C be seen by a therapist experienced in treating abused children and that she have no contact with grandmother pending further investigation.

On receiving the report from Liberty House, DHS administered a polygraph examination to grandmother, which was inconclusive. A second polygraph administered one week later was reportedly "negative for sexual abuse," and DHS issued an opinion that the sexual abuse claim was "unfounded."

Even though all of this information was before the trial court at the May 2002 hearing, the court ordered that supervised visits be started weekly, specifically noting that supervision was ordered only for the purpose of easing the children's transition, given that they had not seen grandparents since August 2000. Over parents' objection, the court granted grandparents' request that the visits be supervised by grandfather's niece, Michelle Lindemann, who is a social services worker known to the trial judge but who also testified on behalf of grandparents in the hearing on their original petition. At a further status hearing a month later, several more weekly visits were scheduled, half supervised and half unsupervised.

Between the May hearing and a hearing held in late August 2002, the children had weekly supervised and unsupervised visits with grandparents. During that time, C had several sessions with Dr. Cynthia Savoie-Phillips, a child psychologist. In addition to interviewing C and both parents, during her sessions with C, Savoie-Phillips used play therapy, a recognized form of psychotherapy that is designed to assist younger children, for whom verbal expression is difficult, to more naturally express their thoughts, feelings, and experiences. Savoie-Phillips's reports of those sessions are remarkable in several respects.

First, in each session, C's play was characterized by a figure whom she dubbed the "evil queen," who kidnapped or captured little girls and put them into cages or traps. C put 12 to 15 little dolls into cages and would routinely check on them each session to make sure they were still there and would add more. In C's play, occasional efforts to help the little girls or confront the evil queen were always unsuccessful.

Second, in the course of C's play, she would comment about her fears that grandmother would take her away from mother and about threats that grandmother would make to her while taking her aside during visits. She frequently commented that grandmother "tells me to keep secrets," including instructing C not to tell anyone about an incident in which M had burned his finger while at grandparents' house. C reported that grandmother also had told her not to tell "what she did to me"—which C described as grandmother using her finger to rub C's "crotch" inside her underwear for about two minutes. C also frequently commented that grandmother had called mother names and said unkind things about mother. Each week C became more anxious about talking to Savoie-Phillips, recounting threats grandmother made to her for "lying" about grandmother. Eventually C disclosed that grandmother had threatened to spank C or "touch" her again if she talked to Savoie-Phillips. C also indicated that grandmother had told her to "say to the judge that I lied to everyone" and to "tell everyone that I lied that she touched me." When C indicated that she did not understand who the "judge" was, Savoie-Phillips explained to her that the judge is the person who decides who is telling the truth and that the judge "mostly just wants to know if its [sic] safe for you to be

at Gramma's." C reportedly looked straight at Savoie-Phillips and said, "He does? Well, it *isn't* really very safe. It isn't safe at all."

Third, mother reported to Savoie-Phillips that, since visits with grandparents had resumed, all three children had begun wetting their pants regularly and were waking up screaming from nightmares and showing signs of extremely high anxiety. Mother also reported that C had been repeatedly provoking and pushing limits with parents and her maternal grandfather (who lived with the family), sometimes screaming, "Hit me! Hit me!" C reportedly would play chase games that would escalate out of control, with C kicking and screaming, until someone (usually C or the older of her brothers) would get hurt. Mother also reported that C was calling her brothers bad names and would report that "Gramma says it." C affirmed this privately with Savoie-Phillips.

Savoie-Phillips interpreted C's play as indicating that C did not see a way to escape her feelings of being trapped and under the control of grandmother. She opined that the evil queen in C's play represented grandmother, consistent with C's comments in the context of her play. She noted that often the little girls in C's play would cry out for help from their mothers, but to no avail, indicating C's feelings of helplessness and futility. In every session C used a Sleeping Beauty figure, asleep in her case. Savoie-Phillips commented that victims who are having dissociative problems often will represent themselves in some way as being asleep and therefore "safe" from the trauma.

Savoie-Phillips opined that C was suffering from post-traumatic stress disorder (PTSD) as well as increasing anxiety and distress as a direct result of the visits with grandmother. She identified the trauma as C's experience of "the constant, relentless attack on her family, on her mother, her whole sense of security and safety," along with "feeling that she has to * * * be two different people, one person when she's with Grandma and then somebody else when she's at home." It was evident to her that C did not feel safe with grandmother, and she opined that a sense of safety and security was of primary, critical concern in the treatment of PTSD. She opined that C's relationship with grandmother

was "very, very toxic to her" and recommended that all visits with grandmother be stopped immediately. She also recommended against the two boys having visits with grandmother because of the likelihood that grandmother would manifest similar destructive behavior with them.

Eventually the supervised visits (still alternating with unsupervised visits) were moved to Family Building Blocks, following C's reports to Savoie-Phillips that grandmother was taking her aside and threatening her while Lindemann was supervising visits at grandparents' home. Reports of the visits at Family Building Blocks indicated that C seemed happy to see grandmother and jumped into her arms upon seeing her. A videotape that grandparents submitted of a visit to the zoo indicated similar happiness on the part of the children at seeing grandparents. However, Savoie-Phillips found this to be dissociative behavior very typical of people suffering from PTSD:

> "What you see is the child will behave one way when [she's] with, say, her grandmother, and when she's away from her grandmother will say, 'I'm afraid of her, she's mean.'
>
> "For [C] it's not safe for her to try to stand up to her grandmother. And so when she sees the grandmother, I think she completely disassociates all of the stress and fear that she has of her grandmother.
>
> "That's very typical, especially with young children, when they feel like they're trapped in a dangerous situation."

Savoie-Phillips rejected the trial judge's suggestion that the family's move to Wyoming or the conflict between mother and grandmother were the source of C's trauma.

Grandparents' evidence consisted only of testimony that the visits were going well, pictures and a videotape of visits, and further testimony from grandparents regarding their original allegations that parents were abusive toward the children. The record contains no expert evidence to rebut Savoie-Phillips's testimony that the visits with grandparents were destructive to C and potentially destructive to T and M. Savoie-Phillips found no reason to believe that C had been

"coached" to make allegations against grandmother and rejected suggestions that C's behavior was attributable to the family's move to Wyoming or to physical discipline that may have been meted out by parents. Additionally, an attorney appointed to represent the children's interests recommended that visits with grandparents be terminated.

Nevertheless, the trial court rejected parents' request for modification of the original visitation judgment. The court's findings consisted only of the statement that "there is no substantial change in circumstances to require deviation from the original terms and conditions of the Judgment of Visitation." Parents appeal that ruling.

■ Before addressing the merits, we must address a preliminary issue regarding reviewability of the trial court's order. Grandparents, citing prior cases of this court and the Oregon Supreme Court, contend that parents waived *de novo* review by consenting to the trial judge's interview of the children off the record. The circumstances giving rise to the interviews are not clear from the record, nor is the content of the interviews. In *Rea and Rea,* 195 Or 252, 279-80, 245 P2d 884 (1952), the Supreme Court announced that *de novo* review would not be conducted in custody cases if the trial court, with the consent or "informed acquiescence" of the parties, made an independent investigation of the case off the record. The court applied the general rule that *de novo* review could not be conducted unless the reviewing court has before it all of the evidence on which the trial court based its decision and noted that, because "the trial judge, aided by his staff, is in a better position to determine custody than is this court, we see no objection to a procedure whereby parties, in effect, agree that the decision of the trial judge who has had the benefit of testimony in open court, plus independent investigation, shall be final." *Id.* at 279. That rule has been applied to preclude *de novo* review in custody cases where interviews with children in chambers were not made part of the trial court record. *See Schuyler v. Haggart,* 224 Or 530, 356 P2d 955 (1960) (review *de novo* of a change in custody from the mother to the father was waived where the trial court considered a report from a prior case and interviewed the parties' daughter in chambers with the parties' consent but neither the report nor a transcript of the interview was

available to the court on appeal); *Lackey v. Lackey,* 29 Or App 673, 564 P2d 293 (1977) (review *de novo* of a custody order was waived where the trial judge decided custody after interviewing the parties' children by stipulation).

The trial court's interviews of the children in this matter do not preclude our *de novo* review, however. In contrast to the cases cited by grandparents, there is nothing in the record here from which we may imply that the parties consented to use of the interviews to decide the question before the court—that is, whether the best interests of the children require that the original judgment be modified.[7] The record contains no order or request for interviews by the judge and no indication that parents were notified of the intended scope of the interviews. Rather, the first mention of the interviews—a description by the trial judge—appears in the transcript of the August 2002 hearing, after the interviews had already occurred:

"While we're here I'll make the record, I talked with [C] in chambers, with counsel and without counsel because there was a time period where she did not want to speak with the attorneys around.

"And I had my dog in there to try to help make things be a little bit more comfortable for her, and she sat on the couch and I find her to be candid, competent. And then I had the attorneys come back in and had her recite—or I recited to them what she disclosed to me and she either acknowledged that in fact they were true or not, so.

"That's the first time I've ever talked to a child about something like this.

"So anyway, that kind of makes the record with regard to that.

"I did talk to the boys, [M] and [T], they were fine to talk, as I stated earlier. I find them—they were competent. They [inaudible—poor recording] also.

"And so that was the testimony that was given off the record, but in counsels' presence, or at least having counsel

---

[7] See 194 Or App at 45, for a discussion of the issues that were presented to the trial court for decision.

back. And that could be for whatever it's worth when we get to the point of assessment of all that."

Parents contend that they did not understand that the in-chambers interviews were for investigation purposes but rather believed that they were only to assess how the children liked having the visits held at Family Building Blocks—and indeed, the record does indicate that the judge asked C about that topic.[8] Although the record also indicates that the trial judge asked C about other topics, the scope and content of that discussion is not at all clear.[9]

---

[8] The trial judge commented as follows:

"The information that [C] gave me is quite frankly that she liked being around people that are nice to her and she doesn't like being around situations where people are not.

"* * * * *

"She likes Family Building Blocks, she doesn't like to travel too much. But I told her I [said] I was the one that ordered it, she said oh, okay. I mean, it is a nice facility and they have fun things to do there."

Additionally, in requesting that Savoie-Phillips continue her assessment of C, the trial court instructed her to inquire further regarding the visits at Family Building Blocks:

"You know, there are some things that I wouldn't mind you talking to her about. How were the things, the visits in the controlled situation, you know. I got a different sense when I was talking to her and I don't know where the keys necessarily are coming for her. Or what kind of cues she picks up on and what kind of information from whatever the source. 'Who am I supposed to say what to when and where.' 'Cause I get the sense that she is caught in the middle.' "

[9] In the context of addressing Savoie-Phillips's testimony, the trial court commented further regarding C's comments in chambers:

"And so get to the point about yes, this has now been brought up as a sexual-abuse thing, and we're through that, okay. Because I know what she said to me, you know what she said to me, * * * what [C] said in chambers, okay.

"I mean, I have [Savoie-Phillips's] report and I respect what's been put in there, okay. And there was a lot of statements that [C] made in that report that would be admissible * * *. Okay? They're all coming in, you know. And statements that she relayed about what Grandma said to her.

"I acknowledged in chambers those are statements, again, by—admissions by a party opponent. At least for whatever they're worth they're admissible, we'll weigh whatever they're gonna be. * * *

"But I don't need for you to go through and relate whether it's 'shit,' 'damn it,' or the other words that were relayed to me by [C] that are also in the report that are attributable to Grandma * * *.

"* * * * *

"* * * I'm happy to note the resilience of the kids, all three of them, because I had a chance to talk to them personally myself, with regard to—they understand that conflict exists."

Moreover, the record does not establish that the trial judge in fact conducted an investigation within the meaning of *Rea*. As we have recognized elsewhere, a trial judge's independent investigation that has no evidentiary value does not preclude *de novo* review. In *Breuer v. Covert,* 47 Or App 225, 228-29, 614 P2d 1169, *rev den,* 290 Or 157 (1980), we held that a site view conducted by the trial judge in a land dispute did not prevent *de novo* review where there was no reason to conclude that the site view served any purpose other than to help the judge understand the evidence in the record. The Supreme Court also has recognized that off-the-record interviews of the parties need not prevent *de novo* review where the interviews have no evidentiary value. *Omlie et ux v. Hunt,* 211 Or 472, 316 P2d 528 (1957). *Omlie* was an adoption case where the trial judge had interviewed the parties off the record but purported to have rendered his decision based only on evidence in the record. The Supreme Court noted that *Rea* was "strictly limited to cases in which the independent investigation relates to * * * the determination by the court of the welfare of a child who is a ward of the court." *Id.* at 476-77 (citing *Rea,* 195 Or at 257). The record in *Omlie,* by contrast, indicated that the interviews apparently did not have evidentiary value with respect to the dispositive issues and, "[l]ike a view of the premises, * * * could assist the trial court in understanding the evidence, without * * * constituting evidence." *Id.* Likewise here, the interviews with the children at most may have assisted the trial court in understanding the evidence, but the record does not establish that the judge conducted an investigation yielding evidence on the dispositive issues.

In all events, without an indication that parents were informed that the judge intended to use the interviews with the children to gather evidence for use in deciding the ultimate question of their best interests regarding visitation with grandparents, even the apparent presence of counsel during portions of the interviews does not establish on this record that the parties acquiesced to use of the interviews for that purpose. We decline to imply consent that would constitute a waiver of *de novo* review under these circumstances.[10]

---

[10] As we explain below, the substantive standard in this modification proceeding focuses on the best interests of the children. *See* 194 Or App at 44-45. The

■     We now turn to the merits. At the time of parents' motion to modify the judgment, visitation rights of all nonparents, including grandparents and stepparents, were governed by the 2001 amendments to ORS 109.119.[11] ORS 109.119 contains the legal standards and governing procedures for the *initial* award of visitation by a nonparent, including a "presumption that the legal parent acts in the best interest of the child." ORS 109.119(2)(a).[12] However, apart from indicating that the presumption "does not apply in a proceeding to modify an order granting relief under this section," ORS 109.119(2)(c), the statute does not provide a process or standards to govern modification of visitation.[13] *See Lear v. Lear*, 124 Or App 524, 527, 863 P2d 482 (1993)

---

vitality of the waiver rule in such a context is open to serious question. Indeed, even the concurring opinion in *Rea*—where the parties clearly had agreed to an independent, off-the-record examination by the trial judge—expressed reservations regarding application of the waiver rule in custody cases. *Rea*, 195 Or at 283-84 (Latourette, J., specially concurring) (reasoning that, "[i]f parties to a divorce proceeding want to stipulate away their own rights, that is one matter, but to enter into a binding agreement affecting the future welfare of the child is another" and opining that the record was sufficient to enable review under the circumstances presented). In all events, we need not decide in this case whether the waiver principle remains defensible, as we conclude that no waiver occurred on these facts.

[11] For a discussion of ORS 109.119 (1999) and *former* ORS 109.121, the statutes under which the original petition was decided, see 194 Or App at 33-34.

[12] ORS 109.119 was amended again in 2003 in ways that do not affect our decision in this case. *See* Or Laws 2003, ch 143, §§ 1, 2; Or Laws 2003, ch 231, §§ 4, 5; Or Laws 2003, ch 576, §§ 138, 139.

[13] In the context of the modification proceedings in the trial court and on appeal, parents have argued (and grandparents concede) that parents' decisions regarding visitation are entitled to the considerable deference accorded to the custodial parents in *Troxel* and in our subsequent decisions interpreting it. However, neither party has addressed the provision in ORS 109.119(2) that the *statutory* presumption "that the legal parent acts in the best interest of the child * * * does not apply in a proceeding to modify an order granting relief under this section." It is unclear whether the underlying visitation judgment, which parents here sought to modify, constitutes an "order granting relief under this section," given that the underlying judgment was granted under prior, substantially different versions of the statute and did not otherwise address the constitutional presumption described in *Troxel*. The parties also have not addressed whether *Troxel* imposes requirements for a presumption beyond that specified in the statute under these circumstances. While the Oregon Supreme Court addressed in *O'Donnell-Lamont and Lamont*, 337 Or 86, 91 P3d 721 (2004), whether the statutory presumption in ORS 109.119(2)(a) satisfied *Troxel*'s constitutional requirements, the court did not address whether ORS 109.119(2)(c)'s elimination of the presumption in modification proceedings is permissible under *Troxel*. We need not address those questions, because we conclude that the best interests of the children require that the visitation judgment be modified to terminate any further right to visitation, even without application of a presumption in favor of the parents.

(holding that a prior version of ORS 109.119 did not address the standards for a *custody* modification). Accordingly, we turn to our case law concerning the modification of a visitation award in a judgment between two parents.

■ Our case law establishes that changes in visitation between *parents* are governed by an assessment of the best interests of the child, without requiring a showing of change of circumstances. Although a showing of a "substantial change of circumstances" is required before any inquiry into whether the best interests of the child require modification of parental *custody*,[14] our decisions do not require such a showing to modify a parental *visitation* order.[15] The Supreme Court likewise has recognized that modification of parental visitation rights does not require a showing of substantial change in circumstances but, rather, only a showing that the change of visitation will benefit the children. *Ortiz and Ortiz,* 310 Or 644, 650, 801 P2d 767 (1990) (addressing whether a visitation order was a "custodial order" for purposes of the change in circumstances rule in a request for modification of custody). We hold that the changes in nonparent visitation likewise are governed by an assessment of the child's best interests and that a substantial change in circumstances need not be demonstrated.

In this case involving nonparent visitation, the trial court's determination that a substantial change of circumstances is a necessary prerequisite to the modification of visitation lacks justification under the case law that we have discussed. The trial court determined only that there was no change of circumstances and, accordingly, did not

---

[14] *Henrickson v. Henrickson,* 225 Or 398, 402-03, 358 P2d 507 (1961); *Collins and Collins,* 183 Or App 354, 357-58, 51 P3d 691 (2002).

[15] *See Sundberg and Sundberg,* 150 Or App 349, 355, 946 P2d 296 (1997), *rev den,* 326 Or 464 (1998) (inquiring only into the child's best interests in addressing the father's motion to modify a visitation order); *Jackson and Jackson,* 147 Or App 500, 504-06, 936 P2d 1043 (1997) (addressing competing requests for modification of both custody and visitation and finding no substantial change of circumstances to justify a change in custody but modifying visitation based solely on an inquiry into the best interests of the children); *Kingsbury and Kingsbury,* 141 Or App 304, 309-11, 917 P2d 1055 (1996) (affirming indefinite suspension of the father's visitation based solely on an inquiry into the child's best interests); *DeSantis and DeSantis,* 109 Or App 76, 79, 817 P2d 769 (1991) (denying father's renewed request for visitation based solely on an inquiry into the child's best interests).

address the best interests of the children. Although parents did not challenge that error in the trial court's analysis after it issued its findings, we are obligated to apply the appropriate standard of law to the facts that we find on *de novo* review. We proceed to apply that standard here, as we have done in some other cases,[16] rather than remanding to the trial court for a "best interests of the child" determination, because the record so overwhelmingly favors parents that, even if the trial court on remand were to find in favor of grandparents, we would reverse and find in favor of parents. Moreover, the record is fully developed and time is of the essence if we are to meaningfully address our clear sense of the children's best interests. Under these circumstances, remand would serve no purpose.

Based on our careful review of the record, we find considerable and persuasive evidence that continued visits with grandparents are not in the children's best interests. That evidence includes unrebutted expert testimony, which we find to be persuasive, that C's relationship with grandmother is "very, very toxic to her," that she does not feel safe with grandmother, that she experiences visits with grandmother as representing a threat to her relationships with her mother and her immediate family, which has caused her to develop PTSD, and that the visits likewise expose the two younger children to unacceptable risks of harm because grandmother is likely to manifest similar behavior with them. We also find persuasive evidence in the record that all three children are showing signs of distress related to the visits. Finally, we find grandparents' conduct in the course of

---

[16] *See Frederiksen v. Ostermeier*, 162 Or App 430, 435, 986 P2d 1194 (1999) (reversing custody determination and deciding best interests for the first time on *de novo* review); *see Johnson and Johnson*, 154 Or App 560, 564-66, 962 P2d 752 (1998) (same); *May and May*, 136 Or App 481, 485-86, 901 P2d 938 (1995) (reversing an order that denied custody modification without addressing the standards for doing so, and making findings regarding change of circumstances and best interests despite the trial court's failure to do so). *But see Ortiz*, 310 Or at 650 (agreeing with our determination that the record was not adequate to determine what would be in the best interests of the children and concluding that, "[t]herefore, it is necessary to remand" to the trial court for determination); *Francois and Francois*, 179 Or App 165, 171, 39 P3d 265 (2002) (reversing the trial court's determination that there was no substantial change in circumstances to warrant modification of custody between parents but remanding for a determination of the best interests of the children).

these proceedings to be inconsistent with their expressed concern for the welfare of these children.

Reversed and remanded with instructions to modify visitation judgment to terminate grandparents' right to visitation.