Submitted January 8, 2021, reversed and remanded March 15, 2023

Michael Travis PULLEY,
*Petitioner-Respondent,*
*v.*
Deborah HERNDON,
*Respondent-Appellant,*
*and*
Joan Elizabeth GALLAGHER,
*Intervenor-Respondent.*
Multnomah County Circuit Court
17DR22553; A172235

527 P3d 19

Mother appeals from a judgment that granted grandmother's petition for visitation with mother's young child, over mother's objection. Mother contends that the trial court erred in determining that grandmother had rebutted the presumption that mother acts in the best interest of child, as required for the purpose of awarding visitation under ORS 109.119. Specifically, mother contends that some of the trial court's findings in support of the court's best-interest conclusion are either erroneous or did not take into account relevant evidence. Mother asks for *de novo* review under ORAP 5.40(8)(c), asserting that this case is exceptional. *Held*: Because the trial court did not make explicit credibility findings and failed to directly address some of the factors concerning the required rebuttal of ORS 109.119 best-interest presumption, mother's case was exceptional and warranted *de novo* review. Grandmother did not present clear and convincing evidence that rebutted the presumption that mother acts in the best interest of child. Grandmother failed to establish under ORS 109.119 that she was or recently had been the child's primary caretaker and that mother unreasonably limited contact between child and grandmother. Also, grandmother failed to present under that statute any evidence that circumstances detrimental to child existed if relief was denied. Although ORS 109.119 factors are not exclusive, on *de novo* review, the Court of Appeals was persuaded that grandmother failed to rebut the presumption that mother acts in child's best interest. Thus, the trial court erred in granting grandmother's petition for visitation.

Reversed and remanded.

Xiomara Y. Torres, Judge.

Kimberly A. Quach and Quach Family Law, P.C., filed the briefs for appellant.

No appearance for respondent Michael Travis Pulley.

Respondent Joan Elizabeth Gallagher filed the brief *pro se*.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Reversed and remanded.

**ORTEGA, P. J.**

Mother appeals from a judgment in this domestic relations proceeding that granted grandmother's petition for visitation with mother's child, T, who was four years old at the time of the hearing. Several months after mother was awarded sole custody of T, grandmother (father's mother) petitioned the court pursuant to ORS 109.119 to allow visitations, including overnight visitations, after mother restricted grandmother's contact with T and stopped allowing overnight visitations. The trial court granted visitation, concluding that grandmother had presented clear and convincing evidence to rebut the presumption that mother acts in the best interest of T. On appeal, mother contends that the trial court erred in determining that grandmother had rebutted that presumption, that several of the court's factual findings relevant to that determination were erroneous, and that to the extent the trial court made implicit findings regarding some of the factors, the findings did not take into account significant evidence that was presented. Mother asks this court to exercise *de novo* review, asserting that this qualifies as an "exceptional case" for purposes of ORAP 5.40(8)(c). As we will explain, we are persuaded that we should exercise *de novo* review and conclude, based on that review, that grandmother did not rebut the presumption that mother acts in the best interest of T. Accordingly, we reverse the judgment awarding visitation and remand with instructions to dismiss grandmother's petition.

Before addressing the standard of review and mother's reasons for seeking *de novo* review, we first describe the relevant statutory context. Under ORS 109.119, a person "who has established emotional ties creating a child-parent relationship or an ongoing personal relationship with a child may petition or file a motion for intervention with the court having jurisdiction over the custody, placement or guardianship of that child," and in certain circumstances can "grant visitation or contact rights to the person having the ongoing personal relationship." ORS 109.119(1), (3)(b).[1] Before doing so, however, the court must apply ORS 109.119(2) and (4).

_____

[1] The trial court, having made the prior related custody determinations that ultimately resulted in an award of sole custody to mother pursuant to a

ORS 109.119(2) provides, in part:

"(a) In any proceeding under this section, there is a presumption that the legal parent acts in the best interest of the child.

"(b) In an order granting relief under this section, the court shall include findings of fact supporting the rebuttal of the presumption described in paragraph (a) of this subsection."

ORS 109.119(4)(a), in turn, provides:

"In deciding whether the presumption described in subsection (2)(a) of this section has been rebutted and whether to award visitation or contact rights over the objection of the legal parent, the court may consider factors including, but not limited to, the following, which may be shown by the evidence:

"(A) The petitioner or intervenor is or recently has been the child's primary caretaker;

"(B) Circumstances detrimental to the child exist if relief is denied;

"(C) The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor;

"(D) Granting relief would not substantially interfere with the custodial relationship; or

"(E) The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor."

In concluding that the presumption that mother acted in T's best interest had been rebutted by clear and convincing evidence, the trial court made the following factual findings:

"1. [Grandmother] established the existence of an ongoing personal relationship with [T]. [T] lived with [grandmother] for months as [T]'s parents were trying to address marital difficulties and were sorting out future living arrangements. [G]randmother[,] along with her

---

stipulation by father, therefore had jurisdiction over this petition. It is undisputed that grandmother had an ongoing personal relationship with T.

partner, provided caretaking duties for [T] during the time [T] lived with them. [Grandmother] later had ongoing visits, including overnights, once [T] resumed living with * * * mother.

"2.   [Mother] consented, encouraged, and facilitated the ongoing relationship. [She] testified that [grandmother] and [T] were clearly bonded and the relationship benefitted [T] psychologically.

"3.   The [c]ourt previously ordered that all visits with [T]'s father, had to be supervised by a professional supervisor. Father does not currently have a professional supervisor and is not currently exercising visiting time with [T].

"4.   [Mother] abruptly ended contact between [T] and * * * grandmother, despite the psychological impact this would have on [T]. [Mother's] explanation for the abrupt end to the contact clearly evidenced her lack of consideration for the [T]'s emotional and psychological well-being in making this decision.

"5.   [Grandmother] presented enough evidence, under a clear and convincing standard, to rebut the presumption afforded to a parent pursuant to ORS 109.119(2)(a)."

On appeal, mother disputes some of those findings. In particular, to the extent that the first finding relates to the statutory factor concerning whether intervenor "is or recently has been" T's "primary caretaker," mother notes that the court's explicit finding that T had lived with grandmother for "months," and its implicit finding that grandmother had recently been T's "primary caretaker," is not supported by the record. In addition, mother posits that grandmother failed to present evidence, much less clear and convincing evidence, that circumstances detrimental to T existed if relief was denied which, as case law establishes, refers to circumstances that "pose a serious present risk of psychological, emotional, or physical harm to [a] child." *O'Donnell-Lamont and Lamont*, 337 Or 86, 112-13, 91 P3d 721 (2004), *cert den*, 543 US 1050 (2005) (noting that the presumption that a parent acts in the best interests of the child would be almost meaningless if it could be overcome by evidence of possible rather than actual risk). Mother also argues that the court failed to adequately address whether

granting relief would substantially interfere with her custodial relationship, and suggests that, to the extent the court's findings imply that mother's limitation of and eventual cessation of contact between T and grandmother was unreasonable, the record does not support such a finding.

In the absence of *de novo* review, we would "view the evidence, including all permissible inferences, in the light most favorable to the trial court's conclusion." *Kennison v. Dyke*, 280 Or App 121, 122, 376 P3d 301 (2016). And, as noted, under ORAP 5.40(8), we reserve *de novo* review for "exceptional cases." Before doing so, we require an appellant to "identify with particularity the factual findings that the appellant seeks to have the court find anew on the record and [to] concisely state the reasons why the court should do so." ORAP 5.40(8)(b).

We conclude that mother has done so here. Factors we consider in this context include, among others, whether the trial court made express "demeanor-based credibility findings," whether "the trial court's decision comports with its express factual findings or with uncontroverted evidence in the record" and whether the "finding(s) that the appellant requests" this court to make are "important to the trial court's ruling" at issue on appeal. ORAP 5.40(8)(d).

As noted, mother has identified several respects in which the trial court's findings are inaccurate or fail to address the relevant statutory criteria. In that regard, we conclude that this case is similar to *G. J. L. v. A. K. L.*, 244 Or App 523, 261 P3d 47, *rev den*, 351 Or 507 (2011). *G. J. L.*, like the present case, concerned grandparent visitation. There, the grandparents appealed an order denying their petition for visitation and sought *de novo* review. *See id.* We conducted *de novo* review, stating:

> "The trial court's factual findings are brief and do not directly address most of the factors that, under ORS 109.119(4)(a), are central to our analysis. Despite differing accounts from witnesses of some events, the court made no explicit credibility findings, although it did note that the witnesses were 'respectful' and 'thoughtful.' Under the circumstances, we agree with grandparents that *de novo* review is warranted, though we give considerable weight to

the findings that were made by the trial court, which had
the opportunity to observe the witnesses."

*Id.* at 525. Likewise, here, the trial court did not make
explicit credibility findings, and its findings did not directly
address some of the statutory factors concerning the rebut-
tal of the presumption that mother acted in T's best interest.
Moreover, as noted above, mother has identified inaccuracies
in the court's findings. *See Turner and Muller*, 237 Or App
192, 197-98, 238 P3d 1003 (2010), *rev den*, 350 Or 231 (2011)
(reviewing change-of-custody determination *de novo* where
the court made express factual findings but they were lim-
ited and did not mirror the relevant statutory factors).

In light of that standard of review, we set forth
the evidence in the record that we deem pertinent to the
analysis, noting where that evidence is essentially undis-
puted, where it is disputed, and where we are giving weight
to the trial court's explicit or implicit findings in light of that
court's ability to observe the witnesses. We begin with some
basic background.

Mother and father were not married but lived
together until they split up in late October 2017. T was two
and one-half years old at that time, and for six weeks after
the break-up, T resided with grandmother. In December
2017, the court entered a temporary custody order that
split parenting time between both parents, and T had over-
night visitations with grandmother during father's parent-
ing time. However, in February 2018, father experienced
a mental health crisis during which he threatened to kill
both himself and T. After police intervention, the trial court
entered in March 2018 a temporary custody and parenting
time order pursuant to ORS 107.097(3), granting mother
custody. That order provided that father's parenting time
would be "professionally supervised by Safety First or [a]
similar provider."[2]

Both before and after the March 2018 order was
entered, mother facilitated visits between T and grand-
mother, including overnight visits, until September 2018.

---

[2] When mother was eventually granted permanent custody, father stipulated
that his parenting time would be supervised.

Although the parties presented differing evidence about the number of those visits, in light of the trial court's explicit and implicit findings, we find that those visits occurred on a regular basis. And although the parties also presented different evidence about the extent to which grandmother and mother cooperated with regard to T during this period, in light of the trial court's explicit and implicit findings, we find that although mother and grandmother had interpersonal difficulties with each other, they did cooperate regarding T's visitations with grandmother, and grandmother provided support to enable mother to take classes related to an eating disorder during the earlier part of this period. And although T experienced trauma when mother and father broke up and while T was with father during the February 2018 incident, thereafter, T was generally described as a happy and playful child who had good, stable relationships with both mother and grandmother, as well as with his maternal grandmother with whom mother, T, and T's half-sibling lived.[3]

The situation changed in September 2018 when, during one of T's overnight visits with grandmother, grandmother allowed father to visit with T at her home without supervision by Safety First or a similar provider. Mother then informed grandmother that she would allow no more overnight visitations. Over the next several months, however, mother and T did had visits—play dates—with grandmother at public venues, and T and grandmother communicated through Facetime.

In early December 2018, grandmother petitioned the court to order that she be allowed visitation with T. In a supporting affidavit, grandmother averred that she had been unaware that father was not to have contact with T unless supervised by a professional supervisor and that she had allowed such contact one time. She asserted that she

---

[3] Much of the parties' evidence at the hearing detailed interpersonal difficulties that mother and grandmother have had. And indeed, much of their briefing on appeal continues to focus on the details of their past disputes. We do not describe most of those disputes as the details are ultimately not of much significance to our analysis. Suffice it to say that the disputes generally concerned grandmother's criticisms of mother's parenting and what mother perceived as grandmother's interference with the family's life.

had a strong relationship with T and provided significant physical and psychological support to him. She also averred that because of her problematic relationship with father, the only way for her to assure ongoing contact with T was to seek visitation through the court.

During the January 2019 play date, mother, T, and grandmother met at an indoor play park. At some point, mother and grandmother had a disagreement about whether T should be allowed to drink mother's juice drink. After the play date, grandmother contacted T's pediatrician to tell her that mother had an eating disorder and to express concern that T was not receiving adequate nutrition and hydration. Grandmother made a similar report to the Department of Human Services (DHS), indicating that because she was a nurse practitioner, she was mandated to report this as suspected child neglect. T's pediatrician shared with mother what had happened, and thereafter, no visitations occurred between T and grandmother between January 2019 and the date of the hearing on grandmother's petition in July 2019.

At the start of the hearing, grandmother's counsel explained in his opening statement that grandmother did not expect to be able to see T during father's supervised parenting time given their problematic relationship, and thus wished to establish her own time with T. Counsel emphasized that grandmother and T had a very positive relationship, that grandmother's relationship with mother had until recently been positive, and that mother's resistance to visitation related to mother's own feelings rather than to T's best interest. Mother's counsel in opening emphasized that under ORS 109.119, as well as the United States Supreme Court's decision in *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), one of the key factors to be considered was whether "circumstances detrimental to the child exist if relief is denied" and asserted that that was not a factor that grandmother's evidence would be able to satisfy.

The only testimony at the hearing came from grandmother and mother. Grandmother's testimony was generally consistent with the facts recounted above.[4] She

---

[4] We note that there was conflicting evidence regarding the unsupervised visitation with father in September 2018. Grandmother initially indicated that

acknowledged that until the events in September 2018, she had no concerns about the care that T was receiving from mother. Mother testified that she had not worked outside the home since 2013 and that her focus had been on parenting her two children and on her own physical and mental health. She stated that she suffered from a chronic and painful bowel disorder that had required surgery and had led to a diagnosis of atypical anorexia, but that she was doing well and had maintained her weight for over a year. Mother also testified that her various disagreements with grandmother had worsened throughout the summer of 2018, and that in therapy she had begun to reevaluate her relationship with grandmother. She indicated that, during their falling-out in September 2018, grandmother expressed a significant amount of criticism of mother's parenting of both of her children. Mother testified that she felt it was in T's best interest to have a mother who was not in an unhealthy relationship such as the one she had with grandmother, and that she needed the break from grandmother to feel that she was in control of what happened with her children because grandmother had breached her trust.

According to mother, T was happy and healthy and had met all of his childhood milestones on time or early. She indicated that they lived in a stable environment with T's other grandmother, who was involved in the community. She agreed that T had a strong relationship with grandmother and expressed that she had been hesitant to terminate visitation with grandmother to avoid traumatizing T, but had concluded that T was fine, and she noted that T would go for weeks without even mentioning grandmother. She agreed that she was sure that T missed grandmother

---

she was unaware that his visitation was required to be professionally supervised. When asked on cross-examination if she had been aware that father was supposed to have only professionally supervised visitation pursuant to court order, she responded that she had agreed only to not leaving T alone with father. When asked specifically about a message mother had sent her indicating that there was a court order that "says professionally supervised only," she acknowledged that the message had been sent to her but indicated that she did not understand what "professionally supervised" meant and that as a nurse practitioner, she probably qualified as a professional supervisor. Given the trial court's ultimate conclusions in this case, we assume that the trial court implicitly found grandmother to be credible and that she did not understand that father would be in violation of a court order by visiting T on that occasion.

but indicated that she believed that T was nonetheless content. She thought that it was important for T to be with her to maintain and facilitate the relationship between him and his disabled half-sibling who also resided with them. She testified that she and the children had been participating in weekly family therapy since March 2018. On cross-examination, when asked how termination of visits with grandmother benefitted T, mother opined that it benefitted T because it benefited herself by making her happier and healthier, and what was best for her was best for the entire family.

In closing, grandmother's counsel reiterated the position that mother's actions reflected that she acted for her own benefit and not for T's benefit with respect to limiting grandmother's visitation. Counsel acknowledged that grandmother "overstepped her bounds" in contacting T's pediatrician after the January 2019 disagreement, but described the interpersonal problems as being between grandmother and mother and opined that they should not be a barrier to grandmother's relationship with T.

Mother's counsel in closing emphasized the factors set forth in ORS 109.119, which required grandmother to overcome the presumption with clear and convincing evidence that mother does not act in T's best interest. Counsel maintained, as she had in opening argument, that grandmother had failed to adduce the required evidence that circumstances detrimental to T existed if relief was denied. Father, who participated as a party *pro se* but did not testify at the hearing, supported grandmother's petition and expressed a belief that she offered a safe environment for T.

The court took the matter under advisement and, as described above, ultimately made findings in support of a conclusion that grandmother had demonstrated by clear and convincing evidence that mother did not act in T's best interest. The court ordered visitation with grandmother on alternating weekends and one overnight visit per month. The present appeal followed.

As noted, mother's arguments on appeal focus on the trial court's findings and how they relate to the various factors outlined in ORS 109.119, with specific emphasis on

the lack of clear and convincing evidence that circumstances detrimental to T exist if relief is denied. Grandmother's arguments on appeal emphasize the positive nature of her relationship with T.

To reiterate, in this proceeding, it is undisputed that grandmother has an ongoing personal relationship with T, and thus the question before us is whether she demonstrated by clear and convincing evidence that mother does not act in T's best interest. We emphasize at the outset that this determination is not made by a court simply reasoning whether it is in a child's best interest to have visitation with a person with an ongoing personal relationship, then backtracking from that determination to conclude that the parent's decision to disallow that visitation therefore demonstrates that the parent did not act in the child's best interest. *See, e.g.*, *Kennison*, 280 Or App at 125 (Under ORS 109.119, "the court shall grant visitation rights only if it first determines that the legal parent is not acting in the child's best interest. Thus, the court must make findings to support that determination before analyzing whether visitation would be in the best interest of the child."). An understanding of why a simple best-interest analysis does not work becomes clear through examination of some of the history of ORS 109.119.

The legislature made significant amendments to the statute in 2001 shortly after the Supreme Court's decision in *Troxel*. *Troxel*, like this case, concerned grandparent visitation. The *Troxel* Court considered the due process implications of a Washington statute under which a court could grant visitation over the objection of a custodial parent whenever it found that such "visitation may serve the best interest of the child." 530 US at 60. The plurality opinion recognized the fundamental right of fit parents to make decisions concerning "the care, custody, and control of their children," and concluded that the statute allowing a court to grant visitation over parental objections whenever visitation may serve the best interest of the child was unconstitutional. *Id.* at 65-67. The plurality noted that the statute "contain[ed] no requirement that a court accord the parent's decision any presumption of validity or any weight whatsoever" but instead "place[d] the best-interest determination solely in the hands of the judge. Should the judge disagree

with the parent's estimation of the child's best interests, the judge's view necessarily prevail[ed]" under the Washington statute. *Id.* at 67.[5]

The Oregon legislature responded to *Troxel* by amending ORS 109.119, and those amendments were discussed at length in *O'Donnell-Lamont.* In that case, the court undertook *de novo* review of a trial court's decision to award custody of children to the grandparents, over the father's objection, and involved a different aspect of the statute— that is, it involved grandparents who had established a "child-parent relationship" with the children, and were seeking custody rather than visitation, both of which differ from the standards under ORS 109.119 that are at issue here.[6] *O'Donnell-Lamont*, 337 Or at 89, 102-04. Nonetheless, *O'Donnell-Lamont* has provided significant guidance in our subsequent cases involving the statute at issue in this case.

In *O'Donnell-Lamont*, after examining the various opinions in *Troxel*, the court concluded that "a majority of the Court strongly indicated that the presumption in favor of a parent's decisions was not so strong that it could be overcome only by a showing that the parent poses a risk of harm to the child." *Id.* at 101. In light of its conclusion that the legislature in amending ORS 109.119 was attempting to make the statute align with *Troxel*, the court indicated that the statutory presumption that a fit parent acts in the best interest of a child "can be overcome without showing that a parent is unable to care for the child or will harm the child." *Id.* at 107. It then discussed the rebuttal factors at issue in that case, some of which are mirrored by those at issue in the present

---

[5] The plurality in *Troxel* noted that there was no evidence that the custodial parent was unfit, and that the trial court had presumed that it was "normally in the best interest of the children to spend quality time with the grandparent" absent evidence that the grandparents were going to adversely affect the children. 530 US at 69. The plurality stated that due process required that the court "accord at least some special weight to the parent's own determination," and that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Id.* at 70, 73.

[6] In particular, several of the considerations at issue in custody cases do not apply to visitation questions, and where the intervenor has established a child-parent relationship with the child, the presumption that the parent acts in the child's best interest may be rebutted by a preponderance of the evidence rather than by clear and convincing evidence.

case, and in particular, what was meant by "circumstances detrimental to the child exist if relief is denied." *Id.* at 112. It noted that "ORS 109.119, by using the present tense of the verb 'exist,' focuses on whether *present* circumstances cause *present* detriment to the child." *Id.* (emphases in original). The court concluded that "'circumstances detrimental to the child'" as used in the statute "refers to circumstances that pose a serious present risk of psychological, emotional, or physical harm to a child." *Id.* In concluding that the grandparents in that case had demonstrated that factor by a preponderance of the evidence, the court found, based in part on expert testimony by a child psychologist, that the "father's lack of understanding of the children's emotional and developmental needs, his difficulty in controlling his own anger, and his lack of insight, considered together, pose a serious risk of psychological or emotional harm to the children." *Id.* at 113. The court further noted that the father's residential instability reflected not the necessities of life but that "he wanted to leave behind problems or conflicts with other people," and that his moves "were [often] abrupt and undertaken with minimal planning or consideration of the interests of the children." *Id.* at 114.[7]

Our case law subsequent to *O'Donnell-Lamont* has likewise addressed the statutory factor of whether "[c]ircumstances detrimental to the child exist if relief is denied." ORS 109.119(4)(a)(B); ORS 109.119(4)(b)(C). In particular, the parallels between the present case and *G. J. L.*, which like this case involved grandparent visitation rather than grandparent custody, are instructive. In that case, the child

_____

[7] The *O'Donnell-Lamont* court also discussed several other factors that are similarly applicable in the present case—whether the grandparents were or had recently been the primary caretaker, whether the father had consented to the relationship between the grandparents and the children, and whether the father had unreasonably denied or limited contact between the grandparents and the children. 337 Or at 111, 115-16. There, the children had lived with the grandparents for a significant portion of their lives. *Id.* at 111. Regarding the factor of whether the father had consented to the relationship between the grandparents and the children, the court found that he had, but concluded that no weight should be accorded to this factor because it did "not indicate in any way that he does not act in the best interests of the children." *Id.* at 115-16. As for whether the father had unreasonably limited or denied contact with the grandparents, the court noted that the father had, in fact, left the state with the children "in violation of a court order, in breach of his promise to the trial judge, and without notice to [the] grandparents or the court." *Id.* at 116.

was removed from his parents' home and placed in foster care with the grandparents when he was 10 months old and remained with his grandparents for 14 months. *G. J. L.*, 244 Or App at 526-27. Some months after the parents regained custody, they cut off contact with the grandparents, who then sought visitation pursuant to ORS 109.119. *Id.* at 525-26. The grandparents presented evidence, through their testimony and that of daycare providers, that their relationship with the child was strong and that "being cut off from them would be detrimental to him." *Id.* at 528. The mother, by contrast, believed that she should make all decisions concerning the child's welfare, that he needed time to reconnect with her and the father, and that the focus should be on their relationships with him, not the grandparents' relationship with him. *Id.* The trial court denied visitation, concluding that the presumption had not been rebutted by a preponderance of the evidence,[8] noting that the child was developing normally and was bonded to his parents, and although the grandparents had contributed significantly to his positive development, a "significant[ly] unhealthy relationship" existed between the mother and the grandparents that had a negative impact on the child. *Id.* at 528-29.

This court affirmed. First, we noted that although the grandparents had been primary caretakers for the child for 14 months, the mother had been the primary caretaker for 16 months, including the six months prior to the hearing, and thus accorded that factor little weight. *Id.* at 531. Regarding whether the mother had fostered the relationship between the grandparents and the child, we noted that she had initially encouraged the child's placement with the grandparents and concluded that the grandparents had sufficiently proved that factor. *Id.* at 533. Similarly, given the evidence that the mother cut off visitation, we concluded that the grandparents had established that she had unreasonably denied or limited contact. *Id.* at 534.[9] The primary

---

[8] *G. J. L.*, like *O'Donnell-Lamont*, involved a situation where the grandparents had established a child-parent relationship, and therefore the statutory presumption needed to be rebutted only by a preponderance of the evidence. *Compare G. J. L.*, 244 Or App at 530, *with O'Donnell-Lamont*, 337 Or at 109-10.

[9] We also considered the extent to which the amount of visitation sought by the grandparents—49 days per year—would interfere with the mother's custodial relationship. *G. J. L.*, 244 Or App at 526, 533. Because that part of the

difficulty, though, was with the lack of evidence that the child would "face a serious present risk of harm if [the grandparents'] petition for visitation [wa]s denied." *Id.* at 532. We stated:

> "As the trial court found, [the child] is developing normally, and mother and father are meeting his material and emotional needs. On this record, it appears that [the child] sometimes becomes upset when he leaves mother's home for grandparents' home and when he leaves grandparents' home for mother's home, and it appears possible that, over the long run, [the child] may suffer from losing relationships. That evidence, however, does not establish the sort of serious present risk of harm needed to prove detrimental circumstances under ORS 109.119(4)(a)(B)."

*Id.* at 532-33. We therefore determined that the grandparents had not proven the "circumstances detrimental to the child" factor. *Id.* at 533.

With those cases in mind, we return to the factors set forth in ORS 109.119(4)(a) and the trial court's findings.

*Whether grandmother is or recently has been the child's primary caretaker.* It is not clear precisely how the trial court weighed this factor. It found that T had lived with grandmother "for months as [T]'s parents were trying to address marital difficulties." The evidence was undisputed, however, that T lived with grandmother for six weeks when mother and father first separated. During that six-week period, grandmother could be said to have been the primary caretaker. However, that had occurred over a year and one-half before the hearing in this case. On this record, it is clear that mother is and has been T's primary caretaker throughout the vast majority of his life. *See, e.g., Strome and Strome*, 201 Or App 625, 634, 120 P3d 499, *rev den*, 339 Or 701 (2005) (evidence that the grandmother was primary caretaker for four years was "offset by evidence that [the] father was the primary caretaker in the 10 months prior to the hearing"); *G. J. L.*, 244 Or App at 531 (where the grandparent had been primary caretaker for 14 months, the court afforded that little weight in light of the amount of time that

---

analysis has little relevance to the facts of the present case, we do not discuss it further.

the mother had been primary caretaker, including the six months prior to the hearing). We conclude that grandmother did not establish this rebuttal factor by clear and convincing evidence.

*Whether mother has fostered, encouraged, or consented to the relationship between the child and grandmother.* The trial court explicitly found that mother "consented, encouraged, and facilitated the ongoing relationship." We agree. In light of the trial court's explicit finding and its implicit credibility findings, we conclude that prior to September 2018, mother fostered and consented to the relationship between T and grandmother, and in fact benefitted from grandmother's care of T to the extent that it freed mother to pursue some of her own health-related goals. Grandmother established this factor by clear and convincing evidence.

*Whether granting relief would not substantially interfere with the custodial relationship.* The trial court did not make any finding regarding this factor. Grandmother points out that she is seeking only two visits per month, with one being an overnight visit. Our case law has not addressed consideration of this factor in any amount of detail, but we conclude that it encompasses more than just the number of days of visitation that a person seeks. It also should take into consideration the extent to which an intervenor has substantially interfered, or attempted to interfere, with the custodial relationship in the past. Here, grandmother facilitated a visit between T and father that occurred in violation of a court order. *Cf. O'Donnell-Lamont*, 337 Or at 116 (considering the father's violation of a court order in determining whether a parent had unreasonably denied contact). Giving deference to the trial court's implicit credibility finding that grandmother facilitated this violation of a court order unwittingly, we nonetheless conclude that it provides at least some evidence of interference with the custodial relationship. More importantly though, we find that grandmother's actions in contacting T's pediatrician to reveal personal health information about mother and to suggest that mother was depriving T of food and drink—and making a similar report to the DHS—demonstrated a willingness to interfere in mother's custodial relationship with T. Although

we note that grandmother's counsel at the hearing admitted that grandmother had "overstepped her bounds" by doing so, that admission does not undermine the significance of those actions. The record does not demonstrate, nor in fact did grandmother endeavor to demonstrate, that mother has actually deprived T of necessary sustenance or done anything else that called into question her fitness to parent T. Accordingly, we do not accord this factor any significant weight in support of grandmother's assertion that mother does not act in T's best interest.

*Whether mother has unreasonably denied or limited contact between T and grandmother.* The trial court found that mother "abruptly ended contact" between T and grandmother and did so in a manner that the court viewed as unreasonable. As noted, mother asserts that that finding is not supported by clear and convincing evidence. On *de novo* review, we conclude that mother did not "abruptly" end all contact. In September 2018, after father's violation of the court order by visiting T during T's visit with grandmother, mother significantly *limited* grandmother's contact with T, but continued to allow contact through Facetime and when mother was present. Mother did end all contact after the January 2019 incident at the play park, but given the circumstances—in particular, a disagreement about a juice drink that resulted in grandmother's subsequent contact with T's pediatrician and DHS to complain about mother— a cessation of contact was, if not the only reasonable option mother had, at least an understandable one. *See Van Driesche and Van Driesche*, 194 Or App 475, 484-85, 95 P3d 262 (2004) (the mother did not unreasonably deny contact with the stepfather because her denial "appear[ed] reasonable in light of the acrimonious nature of the parties' relationship and [the] child's exposure to that hostility"). We conclude that grandmother did not prove by clear and convincing evidence that mother's limitation and subsequent cessation of contact between T and grandmother was unreasonable.

*Whether circumstances detrimental to the child exist if relief is denied.* This factor is perhaps the most nuanced of all of the factors, as it can take into consideration a wide variety of circumstances. The trial court found that when mother terminated T's visitations with grandmother, she

did so "despite the psychological impact this would have on T." The court also found that mother's "explanation for the abrupt end to the contact clearly evidenced her lack of consideration for [T]'s emotional and psychological well-being in making this decision." We understand the trial court's conclusion most likely to be based on mother's testimony that she terminated contact with grandmother for the benefit of her own mental health, as well as mother's related testimony that she believed that what was best for her own mental health was necessarily in T's best interests. We further note that there was ample evidence that mother was aware that ceasing visitation with grandmother could be traumatic for T, although she further testified that after the visits ceased, she observed no signs of trauma and that T would go for weeks without mentioning grandmother. From that evidence, it is possible to conclude, as it appears the trial court may have done, that mother has selfish tendencies, has discounted the strength of the bond between T and grandmother, and perhaps has an unhealthy belief that what is best for her is best for everyone in the family. That evidence falls far short, however, of being evidence that circumstances exist that pose "a serious present risk of psychological, emotional, or physical harm to a child." *O'Donnell-Lamont*, 337 Or at 112.

In *O'Donnell-Lamont*, the court relied on expert testimony from a psychologist to conclude that a parent's "lack of understanding of the children's emotional and developmental needs, his difficulty in controlling his own anger, and his lack of insight, considered together, pose a serious risk of psychological or emotional harm to the children." *Id.* at 113. The *O'Donnell-Lamont* court also relied, among other evidence in addition to the psychologist's evidence, on evidence that the father was unable to identify any potential shortcomings of himself or his partner (a drug user with anger control problems who had lost custody of her own children), and that his residential instability involved moves that were "abrupt and undertaken with minimal planning or consideration of the interests of the children." *Id.* at 113-15.

Here, by contrast, the only testimony was from mother and grandmother, both of whom generally described T as a happy and well-adjusted child. Mother testified that

T has met all of his developmental milestones. Evidence was presented that mother's residence has been stable since she gained full custody of T in March 2018, that she is undergoing individual therapy, and that she and the children have family therapy on a weekly basis. *See G. J. L.*, 244 Or App at 532-33 (where the child was "developing normally" and the parents were meeting his "material and emotional needs," the grandparents failed to establish a "serious present risk of harm" if grandparent visitation was denied, even though it "appears possible that, over the long run, [the child] may suffer from losing relationships"); *see also Van Driesche*, 194 Or App at 484 (rejecting an argument that circumstances detrimental to a child necessarily existed where a child was separated from his stepfather, the only father-figure the child had known, noting that the stepfather "presented no expert testimony to support his view"). In the present case, the trial court assumed, in the absence of any evidence, expert or otherwise, that mother's termination of visitation with grandmother necessarily had a serious and detrimental psychological impact on T. We cannot make such an assumption in the absence of any evidence to that effect, much less in the absence of any clear and convincing evidence.

The factors set forth in ORS 109.119(4)(a) are not exclusive, and neither the statute nor the case law concerning it can provide a specific formula as to how much weight to give any particular factor. Here, however, despite the strong evidence—indeed uncontradicted evidence—that grandmother has a good relationship with T and can provide a stable environment during visits, she has failed to adduce clear and convincing evidence that mother does not act in T's best interest, in light of the considerations set forth in ORS 109.119(4)(a) as outlined above.

Reversed and remanded.